James W. HALEY, Appellant,

v.

Fred A. SEATON, Secretary of the Interior, Appellee.

No. 15565.

United States Court of Appeals District of Columbia Circuit.

Argued May 2, 1960.

Decided June 23, 1960.

1. § 22–2801 D.C.Code (1959).

Mr. Neil F. Stull, Washington, D. C., for appellant.

Mr. Hugh Nugent, Atty., Dept. of Justice, with whom Messrs. Perry W. Morton, Asst. Atty. Gen., S. Billingsley Hill and Thomas L. McKevitt, Attys., Dept. of Justice, were on the brief, for the Secretary of the Interior. Messrs. Roger P. Marquis, Claron C. Spencer and Robert S. Griswold, Jr., Attys., Dept. of Justice, also entered appearances for appellee.

Before PRETTYMAN, Chief Judge, PHILLIPS, Senior United States Circuit Judge for the Tenth Circuit,* and BASTIAN, Circuit Judge.

PHILLIPS, Circuit Judge.

On March 24, 1958, Haley filed five applications for noncompetitive oil and gas leases under § 17 of the Mineral Lands Leasing Act of 1920.[1] The lands embraced in the applications are situated in southeastern Utah in Township 42[2] South, Range 19 East, are unsurveyed, and lie within the exterior boundaries of the Navajo Indian Reservation.

On April 7, 1958, the Land Office in Salt Lake City rejected each of the applications for the stated reason that the

* Sitting by designation pursuant to 28 U.S. Code, § 294(d).

[1] 41 Stat. 437, as amended, 30 U.S.C.A. § 226.

[2] Hereinafter referred to as Township 42.

lands were within the Navajo Indian Reservation, created by executive order of May 17, 1884, and, therefore, not leasable under the Mineral Leasing Act.

Haley duly prosecuted administrative review proceedings. On November 7, 1958, the Director of the Bureau of Land Management affirmed the rejections on the ground that by the Act of September 2, 1958, 72 Stat. 1686, 1687, Congress had placed all the public lands of the United States within the exterior boundaries of the Navajo Reservation in trust for the Navajo Tribe and, therefore, the lands being Indian lands were not available for leasing under the Mineral Leasing Act.[3] That decision was approved on November 17, 1958, by the Assistant Secretary of the Interior.

On June 17, 1959, Haley brought this action in the United States District Court for the District of Columbia, seeking relief in the nature of mandamus to compel the Secretary of the Interior to grant him the oil and gas leases for which he had applied. From a judgment granting the Secretary's motion for a summary judgment and dismissing the action, Haley has appealed.

On May 17, 1884, President Arthur issued an executive order withdrawing certain lands from sale and settlement and setting them apart as a reservation for Indian purposes. Such withdrawal order included Township 42. Excluded from this withdrawal were lands to which valid rights had already attached under existing settlement and location laws.

On October 4, 1909, the Acting Secretary of the Interior made a temporary petroleum withdrawal order, withdrawing 1,128,960 acres of public lands,[4] described in accompanying lists "In aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain." The withdrawal order included Township 42.

On July 2, 1910, pursuant to the Act of June 25, 1910, 36 Stat. 847, 43 U.S.C.A. §§ 141, 142, 143 and 16 U.S.C.A. § 471,[5] President Taft approved an order of withdrawal, which ratified and continued in force Temporary Withdrawal Order No. 15, made April 14, 1910, embracing 581,564 acres of land, located in the State of Utah and including Township 42. Such order of withdrawal was designated Petroleum Reserve No. 7.

On August 25, 1910, President Taft approved an order that recited the approval order of July 2, 1910, and further recited that certain of the lands in Petroleum Reserve No. 7 had been previously withdrawn by the order of October 4, 1909, and ordered that the order of October 4, 1909, insofar as it included 390,000 acres of specifically described lands and which included Township 42, should be ratified and continued in force and effect.

On April 2, 1957, the Acting Secretary of the Interior, under authority of the Act of June 25, 1910, 36 Stat. 847, 43 U. S.C.A. § 141, and pursuant to Executive Order No. 10355 of May 26, 1952, 43 U.S. C.A. § 141 note, entered an order entirely revoking Petroleum Reserve No. 7.

Such order specifically recited that all of the lands in Petroleum Reserve No. 7 were opened "to location for nonmetalliferous minerals under the United States mining laws, subject to valid existing rights and the provisions of existing withdrawals."

On October 25, 1957, the office of the Bureau of Indian Affairs at Window Rock, Arizona, published a notice that certain Indian lands in southern Utah and northern Arizona, including Township 42, were open to sale of oil and gas leases on tribal and allotted lands.[6]

---

3. The Director held that because of the Act of September 2, 1958, the correctness of the decisions of the Land Office when rendered, had become moot.

4. It was stated at the oral argument that only approximately 50,000 acres of such

land lies within the exterior boundaries of the Navajo Reservation.

5. This Act is generally referred to as the Pickett Act.

6. "The sale will be conducted under regulations promulgated by the Secretary

The Act of September 2, 1958, supra, provided that "subject to valid, existing rights, all public lands of the United States within said exterior boundaries of said reservation (the Navajo Reservation) are hereby declared to be held in trust for the benefit of the Navajo Tribe of Indians."

█ Indian lands are not leasable under the Mineral Leasing Act. 34 Op. Atty. Gen. 171 (1924). They may be leased only under special acts providing for the leasing of Indian lands.

█ The orders creating Petroleum Reserve No. 7 and the temporary orders which preceded them do not by express terms revoke any portion of the executive order of May 17, 1884. May a partial revocation be implied? The power of the President to modify the order of May 17, 1884, existed, but his intention to modify such order should not be lightly implied. Because of the duty and obligation of the national government to the Indian tribes and its "avowed solicitude * * * for the welfare of its Indian wards" it is "the rule of construction recognized without exception for over a century * * * that 'doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith.' " [7] At the time the orders creating Petroleum Reserve No. 7 and the temporary orders which preceded them were made, there can be no doubt that Township 42, supra, except possibly small tracts therein, was a part of the Navajo Reservation and was Indian and not public land. The Pickett Act (Act of June 25, 1910), under which Petroleum Reserve No. 7 was established, authorized the withdrawal only of public lands. In order to include Township 42 in the orders creating Petroleum Reserve No. 7, the President first would have had to modify the executive order of May 17, 1884, and restore any portion of Township 42 which was Indian land to the public domain and thereafter order its inclusion in Petroleum Reserve No. 7. Had there been an intention to include any Indian lands in Petroleum Reserve No. 7, we think the President would have first made an order restoring such Indian lands to such public domain. For various reasons, including the lapse of claims valid before the Reservation was established, there were a number of pockets of public land throughout the Reservation. We think it is reasonable to infer that the purpose of describing lands within the Reservation was to include public lands therein, rather than to withdraw lands from the Reservation and restore them to the public domain.

We conclude that Township 42 was a part of the Navajo Reservation at the time the applications for leases were made.

██ For the purpose of determining the effect of the Act of September 2, 1958, supra, upon the applications for leases, we shall assume, but not concede, that Township 42 was public land at the time of the enactment of that Act. If Township 42 was public land at the time of the enactment of the 1958 Act, there can be no doubt that the lands covered by the applications for leases were restored to the Navajo Reservation by such Act, unless Haley had acquired vested rights therein. The applications to lease were in form, and, we think, in legal effect, mere offers to lease. Assuming

of the Interior, 25 C.F.R. 186 (Act of May 11, 1938, 52 Stat. 347; 25 U.S.C.A. §§ 396a–396f) as to tribal lands, and 25 C.F.R. 189 (Act of March 3, 1909, 35 Stat. 781–783; 25 U.S.C.A. 396) as to individually owned lands. The right is reserved to reject any and all bids and to disapprove any lease submitted on an accepted bid. The tribal tracts of land are being offered subject to acceptance by the duly authorized tribal representatives; and the allotted tracts are being offered subject to acceptance by the individual Indian owners."

7. United States v. Santa Fe Pacific R. Co., 314 U.S. 339, 353, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260; Choate v. Trapp, 224 U.S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941.

that Haley was "the person first making application,"[8] he acquired a perference right as against third persons, but in our opinion he acquired no vested rights as against the United States. This conclusion is supported, we think, by the decisions in analogous cases under the Homestead and Preemption Laws.[9]

■ We are of the opinion, for reasons that we shall presently undertake to state, that the Secretary of the Interior had discretion to accept or reject Haley's applications for leases. If that conclusion is sound, then it must necessarily follow that the mere applications for leases created no vested rights in Haley.

As originally enacted, the Mineral Leasing Act of 1920 (§ 17) provided for leases only on "deposits of oil or gas situated within the known geologic structure of a producing oil or gas field * * *." However, § 13 of that Act authorized the Secretary of the Interior to issue an exclusive prospecting permit on land not within any known geological structure.

Section 13 of the Mineral Leasing Act was amended by the Act of August 21, 1935, 49 Stat. 674, to provide:

"That the Secretary of the Interior is hereby authorized, and directed, under such necessary and proper rules and regulations as he may prescribe, to grant to any applicant qualified under this Act a prospecting permit, * * * *Provided*, That said application was filed ninety days prior to the effective date of this amendatory Act. * * *Provided further*, That any application for any prospecting permit filed after ninety days prior to the effective date of this amendatory Act shall be considered as an appli-

cation for lease under section 17 hereof: * * *."

Section 17 of the Mineral Leasing Act provided "that all unappropriated deposits of oil or gas situated within the known geologic structure of a producing oil or gas field and the unentered lands containing the same * * * *may be leased* by the Secretary of the Interior * * *." (Emphasis ours.)

The Act of August 21, 1935, also amended § 17 of the Mineral Leasing Act to read, so far as here pertinent, as follows:

"Sec. 17. All lands subject to disposition under this Act which are known or believed to contain oil or gas deposits, except as herein otherwise provided, *may be leased by the Secretary of the Interior* after the effective date of this amendatory Act, to the highest responsible qualified bidder by competitive bidding under general regulations. * * * *Provided further*, That the person first making application for the lease of any lands not within any known geologic structure of a producing oil or gas field who is qualified to hold a lease under this Act, including applicants for permits whose applications were filed after ninety days prior to the effective date of this amendatory Act shall be entitled to a preference right over others to a lease of such lands without competitive bidding * * *." (Emphasis ours.)

Section 17 of the Mineral Leasing Act was again amended by the Act of August 8, 1946, 60 Stat. 950, to read, so far as here pertinent, as follows:

"Sec. 17. All lands subject to disposition under this Act which are known or believed to contain oil or gas deposits *may be leased by the Secretary of the Interior*. When the

---

8. See Act of August 8, 1946, 60 Stat. 951, 30 U.S.C.A. § 226.

9. See: Frisbie v. Whitney, 9 Wall. 187, 76 U.S. 187, 19 L.Ed. 668; The Yosemite Valley Case, 15 Wall. 77, 82 U.S. 77, 87, 21 L.Ed. 82; Campbell v. Wade, 132 U.S. 34, 38, 10 S.Ct. 9, 33 L.Ed.

240; Russian-American Packing Co. v. United States, 199 U.S. 570, 577, 26 S. Ct. 157, 50 L.Ed. 314; Wagstaff v. Collins, 8 Cir., 97 F. 3, 8; Shiver v. United States, 159 U.S. 491, 495, 16 S.Ct. 54, 40 L.Ed. 231; Martie v. Martie, Okl., 271 P.2d 385, 388.

lands to be leased are within any known geological structure of a producing oil or gas field, they shall be leased to the highest responsible qualified bidder by competitive bidding under general regulations, * *. When the lands to be leased are not within any known geological structure of a producing oil or gas field, the person first making application for the lease who is qualified to hold a lease under this Act shall be entitled to a lease of such lands without competitive bidding. * * " (Emphasis ours.)

It is significant that the phrase "may be leased by the Secretary of the Interior" in § 17 of the original Mineral Leasing Act was carried forward without change in the Amendment of 1935 and the Amendment of 1946, indicating an intent to continue to give the Secretary of the Interior discretionary power, rather than a positive mandate to lease.

It was authoritatively settled that an application for a prospecting permit under § 13, supra, as originally enacted, created no vested right in the applicant.[10]

The court, in United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 418, 419, 51 S.Ct. 502, 504, 75 L.Ed. 1148, held that the provisions of the Mineral Leasing Act plainly indicated "that Congress held in mind the distinction between a positive mandate to the Secretary and permission to take certain action in his discretion. Also, the difference between applicants for mere privileges and those persons who, because of expenditures, or otherwise, deserved special consideration" and " 'that under that Act, [1920] the granting of a prospecting permit for oil and gas is discretionary with the Secretary of the Interior and any application may be granted or denied, * * *.' "

Prior to the amendment of § 17 by the Act of August 8, 1946, this court had held that the Secretary of the Interior had discretionary power to accept or reject an application for a noncompetitive oil and gas lease under § 17.[11]

This court, in United States ex rel. Jordan v. Ickes, 79 App.D.C. 114, 143 F.2d 152, certiorari denied 320 U.S. 801, 64 S.Ct. 432, 88 L.Ed. 484; 323 U.S. 759, 65 S.Ct. 93, 89 L.Ed. 608, held that it was not the intent of Congress by the amendatory Act of August 21, 1935, to deprive the Secretary of the Interior of such discretion accorded him under the original Act, except as to a very limited group of applications filed 90 days prior to the effective date of the amendment.

We are of the opinion that the 1946 amendment in nowise limited such power in the Secretary of the Interior and continued his discretionary power either to grant or reject applications for leases. As observed above, the phrase in § 17 of the Mineral Leasing Act of 1920, as originally enacted, reading "may be leased by the Secretary of the Interior" was not changed by the Amendment of August 8, 1946. It was carried into the amendatory Act. The provision for the leasing of lands within a known geological structure and lands not within any known geological structure applies only to lands "to be leased," plainly implying that the Secretary of the Interior was to determine what lands were to be leased. Accordingly, we conclude that the acceptance or rejection of the applications to lease here involved was a matter resting within the discretion of the Secretary of the Interior.

The Secretary has not determined that the lands covered by Haley's applications are "to be leased" under the Mineral Leasing Act. He has only determined that the lands are Indian lands and that

10. Wilbur v. United States, 60 App.D.C. 11, 46 F.2d 217, affirmed United States, ex rel. McLennan v. Wilbur, 283 U.S. 414, 415, 51 S.Ct. 502, 75 L.Ed. 1148.

11. Wann v. Ickes, 67 App.D.C. 291, 92 F.2d 215, 217; United States ex rel.

Roughton v. Ickes, 69 App.D.C. 324, 101 F.2d 248, 251; Dunn v. Ickes, 72 App.D.C. 325, 115 F.2d 36, 37, certiorari denied 311 U.S. 698, 61 S.Ct. 137, 85 L.Ed. 452.

**626**

they should be leased under the statutes providing for the leasing of Indian lands.

Since the applications for the leases had not been accepted by the Secretary of the Interior at the time the Act of September 2, 1958, was enacted, Congress, under its Constitutional power to dispose of and make all needful rules and regulations respecting "the public lands,"[12] had the power to withdraw the lands described in such applications from the public domain and restore them to the Navajo Indian Reservation, if they were not then a part of such Reservation.[13]

The judgment is therefore affirmed.

12. Frisbie v. Whitney, 9 Wall. 187, 192, 193, 76 U.S. 187, 192, 193, 19 L.Ed. 668.

13. Constitution of the United States, Art. 4, § 3, cl. 2.