**Buck WILLCOXSON, Appellant,**

v.

**UNITED STATES of America et al., Appellees.**

**Buck WILLCOXSON, Appellant,**

v.

**Stewart L. UDALL, Secretary of the Interior, et al., Appellees.**

**Buck WILLCOXSON, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**Nos. 16713–16715.**

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 26, 1962.

Decided Jan. 4, 1963.

---

Mr. John H. Pickering, Washington, D. C., with whom Messrs. Max O. Truitt, Jr., and Thomas G. Watkinson, Washington, D. C., were on the brief, for appellant.

Mr. S. Billingsley Hill, Atty., Dept. of Justice, with whom Ramsey Clark, Asst. Atty. Gen., Messrs. Roger P. Marquis and Ralph S. Boyd, Attys., Dept. of Justice, were on the brief, for appellee United States in Nos. 16713 and 16715, and appellee Udall in No. 16714.

Mr. Jack T. Conn, Ada, Okl., with whom Mr. William Amory Underhill, Washington, D. C., was on the brief, for appellee Kerr-McGee Oil Industries, Inc., in Nos. 16713 and 16714.

Before BAZELON, Chief Judge, and BURGER and WRIGHT, Circuit Judges.

BAZELON, Chief Judge.

These three consolidated actions, decided below on cross motions for summary judgment, involve construction of the "Isolated Tracts Act," Rev.Stat. § 2455, as amended, 43 U.S.C. § 1171 (1958), and the regulations thereunder, 43 CFR Part 250. The Act provides in substance that the Secretary of the Interior may sell at public auction any isolated or disconnected parcel of the public domain, not exceeding a specified size, which in his judgment may properly be sold.[1] It also grants owners of contiguous land a preference right to buy such parcels and provides for equitable division by the Secretary in the event of competing preference rights. The Act does not, however, specify either the manner or the time in which the Secretary is to exercise his judgment whether it would

[1]. The Isolated Tracts Act is one of the few exceptions to the general statutory prohibition against sales of public lands of the United States at public auction (Act of March 3, 1891, ch. 561, 26 Stat. 1099, 43 U.S.C. § 671 (1958)), and is the exclusive authority for the sales which it authorizes.

be proper to sell a particular tract; nor does it provide for the vesting of rights in or passing of title to lands sold. These matters are covered by 43 CFR § 250.5 [2] which provides in pertinent part that

" * * * until the issuance of a cash certificate, the authorized officer may at any time determine that the lands should not be sold, the applicant or any bidder has no contractual or other rights as against the United States, and no action taken will create any contractual or other obligation of the United States."

On September 23, 1952, Willcoxson filed in the Land and Survey Office of the Bureau of Land Management at Santa Fe, New Mexico, applications for the sale of two isolated tracts of land located in that State. In November 1952, the Manager of the Santa Fe Office received reports on the mineral qualities of the tracts from the Bureau's staff.[3] No field examinations were made at that time. The reports stated that "although adjacent areas are now the scene of uranium mining activities, there are no known uranium mining activities within the immediate vicinity" of the tracts; and "recommended that, since it is in the public interest to dispose of these lands, the application[s] be approved and the lands offered in public sale." Accordingly the Manager of the Land Office held public sales of the two tracts on November 16 and 17, 1952.[4] After completion of the various proceedings required by statute and regulation, including the adjustment of competing preference rights and payment of purchase price, Willcoxson was declared the "purchaser" of part of one tract on February 17, 1954, and of part of the other on January 31, 1955. Although the Manager could properly have issued cash certificates to Willcoxson, he did not do so because of a heavy backlog of work in the Santa Fe Land Office.

In May 1955, the Manager learned from Willcoxson that uranium prospectors were on the tracts.[5] Relying on § 250.5, he informed Willcoxson that "action on these two applications has been suspended pending receipt of a report * * * as to the mineral character of the land." In January and February 1956, on the basis of field examinations, the Bureau staff reported to the Manager that "the subject land is potentially valuable for uranium," and "recommended that the land be classified as mineral in character * * * " and that the sales be cancelled and the applications rejected.

In decisions of April 12, 1956, the Manager declared that, "as a result of the reexamination, the subject land has been classified as mineral in character and prospectively valuable for uranium"; and concluded that, since mineral lands may not be sold,[6] and inasmuch as cash cer-

2. The regulation was promulgated pursuant to Rev.Stat. § 2478, 43 U.S.C. § 1201 (1958), under which "the Secretary of the Interior, is authorized to enforce and carry into execution, by appropriate regulations, every part of the provisions of this title not otherwise specially provided for."

3. Such reports are required because one factor bearing on the decision whether to sell is the mineral quality of the land. 43 CFR § 250.8(a) provides in part that "Mineral lands may not be sold except under specific statutory authority which exists for the sale of lands valuable for certain minerals with a reservation of those minerals to the United States." (Section 250.8(a) implements the proscription of Rev.Stat. § 2318, 30 U.S.C. § 21 (1958), that "In all cases lands valuable for min-

erals shall be reserved from sale, except as otherwise expressly directed by law.") In 1952, reservation of uranium rights was authorized by § 5(b) (7) of the Atomic Energy Act of 1946, 42 U.S.C. § 1805(b) (7) (1952) [See 42 U.S.C.A. § 2098(a)].

4. As required, see note 3, supra, the sales were made expressly with the reservation required by the Atomic Energy Act of 1946, even though it was not known at the time that the lands were valuable for uranium.

5. One of the prospectors was Kerr-McGee Oil Industries, Inc.

6. See note 3, supra. By 1956, there was no longer any statutory authority for reservation of uranium rights. See 42 U.S.C. § 2098(b) (1958).

tificates had not issued, the sales were "null and void." The Bureau of Land Management and the Secretary of the Interior affirmed.

On August 5, 1958, Willcoxson commenced the action in appeal No. 16714 (the first of the three cases now before us) to declare invalid the cancellation of the sales and to compel the Secretary to issue cash certificates. Kerr-McGee Oil Industries, Inc., claiming mining rights in one of the tracts, intervened to oppose granting of the relief sought.

The action in appeal No. 16715 was brought by Willcoxson against the United States on December 10, 1958,[7] for $6,000,000 damages arising out of the allegedly illegal cancellation of the land sales.

Finally, on May 29, 1959, the United States instituted the action in appeal No. 16713 against both Willcoxson and Kerr-McGee, seeking, *inter alia,* a declaratory judgment that Willcoxson has no rights in the lands and that the claims of Kerr-McGee are not mature for judicial determination as against the United States. In the same action, Willcoxson cross-claims against Kerr-McGee for injunctive relief and an accounting for the value of minerals removed by Kerr-McGee.

The District Court held that under the regulation "Willcoxson has no rights of any kind as against the United States." It granted the motion of the United States for summary judgment in No. 16713; dismissed Nos. 16714 and 16715 with prejudice; and held that the claims of Kerr-McGee to mining interests "are not yet mature for judicial determination as against the United States." Since Kerr-McGee has prosecuted no appeal, we rule only on the rights of Willcoxson.

Before this court, Willcoxson does not deny that the two tracts are valuable for minerals, nor does he challenge the propriety of a refusal to sell isolated tracts because of their uranium value. His basic contention is that the Secretary is required to exercise his discretion to sell an isolated tract *before* the sale proceedings and that once the sale has been held and a "purchaser" declared, he is precluded from changing his decision on the basis of newly discovered facts.

■■■ The Act contains no such direction. And the regulation provides that "until the issuance of a cash certificate, the authorized officer may at any time determine that the lands should not be sold * * *."[8] There is no conflict between the regulation and the terms of the Act. But Willcoxson advances several arguments to avoid the regulation.

■■ He first contends that in sales under the Isolated Tracts Act "equitable title vests in the purchaser when the price is paid"; that this "cash sale vesting rule [is] but a specific application of a general principle [that] when [public] land is placed in the market or otherwise opened to acquisition, a claimant who fulfills all requirements to perfect his claim thereupon becomes the equitable owner"; and that his equitable title could not be defeated by the subsequent findings as to the mineral qualities of the land. He relies on a line of Supreme Court cases which includes Wyoming v. United States, 255 U.S. 489, 41 S.Ct. 393, 65 L. Ed. 742 (1921); Payne v. New Mexico, 255 U.S. 367, 41 S.Ct. 333, 65 L.Ed. 680 (1921); Benson Mining & Smelting Co. v. Alta Mining & Smelting Co., 145 U.S. 428, 12 S.Ct. 877, 36 L.Ed. 762 (1892); and Atherton v. Fowler, 96 U.S. 513, 24 L.Ed. 732 (1878).

7. It was filed in the United States District Court for the District of New Mexico and subsequently transferred to the court below.

8. Willcoxson suggests that § 250.5 is limited by its terms to "applicants" and does not apply to "purchasers." The plain language and clear meaning of the pertinent part of § 250.5 are sufficient answer to this assertion. Also, we note that the Secretary did not promulgate the regulation until 1944 although the original Isolated Tracts Act was passed in 1846. But we find no rule of law which precludes the Secretary from exercising otherwise valid regulatory power simply because of the passage of time.

888

We agree with the court below that such cases are inapposite since they arose under statutes different from the Isolated Tracts Act. In those statutes Congress chose a method of granting interests in public lands whereby the recipients of the grants had only to prove they met the statutory requirements in order to obtain rights in the lands. Hence, "[t]he power confided to [the Secretary] was not that of granting or denying a privilege * * *, but of determining whether an existing privilege conferred by Congress had been lawfully exercised." Wyoming v. United States, supra, 255 U.S. at 496, 41 S.Ct. at 395. It was with specific and we think limited reference to such statutes that the Court in Wyoming said: "if, when the claimant has done all that he is required to do to entitle him to receive the title, the land is not known to be mineral he acquires a vested right which no subsequent discovery of mineral will divest or disturb." Id. at 501, 41 S.Ct. at 396.

■ But in the Isolated Tracts Act, Congress chose a wholly different method for disposing of interests in the public domain. Instead of limiting the Secretary to "action * * * judicial in its nature and directed to an ascertainment and declaration" of the validity of compliance with the statutory requisites for acquiring the right, id. at 497, 41 S.Ct. at 395, Congress entrusted to the Secretary's discretion the initial decision whether or not to sell isolated tracts of the public domain.[9] The distinction is "between a positive mandate to the Secretary and permission to take certain action in his discretion." United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 418, 51 S.Ct. 502, 504, 75 L.Ed. 1148 (1931), quoted in Haley v. Seaton, 108

U.S.App.D.C. 257, 262, 281 F.2d 620, 625 (1960). An application for sale of an isolated tract is "merely a proposal by the [applicant] which the land officers [can] accept or reject." Wyoming v. United States, supra, 255 U.S. at 496, 41 S.Ct. 394. By providing that the authorized land officer may decide not to sell at any time prior to the issuance of a cash certificate, the regulation in effect denotes issuance of the certificate as acceptance of the applicant's proposal. In ordinary contract parlance, the sales were auctions with reserve. Restatement, Contracts § 27. Until acceptance, no contract rights arose and no equitable title vested. The Wyoming and similar cases cut off from consideration only facts arising after the vesting of rights. In the present case, since no rights in the tracts ever vested, the Manager was free to consider any facts discovered before the issuance of a cash certificate.

■ Willcoxson next asserts that the proviso of the Isolated Tracts Act granting a preference right to adjacent owners gave him a statutory right to the lands which could not be defeated by subsequent findings. It is true that the declarations of Willcoxson as purchaser were based in part on his exercise of preference rights. But the conclusion that the declaration of preference rights is determinative of title has been rejected by the courts at least since The Yosemite Valley Case, 15 Wall. (82 U.S.) 77, 93–94, 21 L.Ed. 82 (1873), where the Court distinguished "a legal right to the land" from "a legal right as against other parties to be preferred in its purchase, when the United States have determined to sell [emphasis in original]."[10] See also Haley v. Seaton, 108 U.S.App.D.C. 257, 281 F.2d 620 (1960).

9. Similar to the Isolated Tracts Act in this regard are § 17 of the Mineral Leasing Act of 1920, as amended, 30 U.S.C. § 226; the Small Tracts Act, 43 U.S.C. § 682a; and the grazing lease provision of the Oregon and California Railroad Grant Land Act, 43 U.S.C. § 1181d.

10. In this connection, Willcoxson also asserts that the real dispute is between him and the uranium prospectors—including Kerr-McGee, and that the Government is a mere stakeholder in the outcome of the present case. We find the contention unsupportable because Willcoxson is seeking full legal title which now rests with the United States whereas the prospectors do not now and may never seek title.

Finally Willcoxson argues that § 250.5 is invalid because inconsistent with Rev.Stat. § 2357, 43 U.S.C. § 678, a provision of general application which provides in part that "at every public sale [of public lands], the highest bidder * * * shall be the purchaser." The short answer is that the Act expressly authorizes the Secretary to sell lands "notwithstanding the provisions of section 678 * * *." Moreover § 678 does no more than specify who shall be the purchaser *if the lands are sold;* it does not purport to affect the timing of the Secretary's decision to sell or the facts on which his decision may rest.

Affirmed.