**John A. SHAW, Plaintiff,**

v.

**Stewart L. UDALL, Secretary of the Interior, United States Government, Defendant.**

**Civ. No. 63–602.**

United States District Court
D. Oregon.

Jan. 13, 1967.

Gordon Keane, Keane, Haessler, Bauman & Harper, Portland, Or., for plaintiff.

Jack G. Collins, First Asst. U. S. Atty., and Sidney I. Lezak, U. S. Atty., Portland, Or., for defendant.

KILKENNY, District Judge:

This cause is here for review of a decision by the Secretary of Interior, in which he denied the plaintiff a selection

of 160 acres of public land in Lincoln County, Oregon, in exchange for certain scrip. This scrip was issued by the United States Government and authorized the selection of tracts of land from the public domain. Plaintiff holds a Valentine Special Certificate for 40 acres,[1] a Gerard Special Certificate for 80 acres,[2] and a Porterfield Warrant for 40 acres.[3] The authenticity and validity of the scrip is admitted by defendant.

In 1960, plaintiff was in need of additional timber for his lumber mill in Willamina, Oregon. In his search for additional timber, he located 160 acres that would fill his need and was advised that this tract could be acquired in exchange for scrip. Plaintiff's attorney had a number of conferences with officials of the Bureau of Land Management (BLM), at which time the officials mentioned a policy of the use of scrip in connection with the acquisition of timber lands and indicated that it was not practical for BLM to continue managing the particular 160 acres. Plaintiff then purchased this scrip for $96,000.00 and, thereafter, filed applications in the Portland office of BLM which covered the 160 acre tract in question. Shaw's application was denied by the Acting Chief of the Special Section of BLM on July 31, 1961, the refusal to classify the land as suitable for satisfaction of the scrip rights being based on the Chief's opinion that the lands should be administered under an intensive forest management program and that the loss of the tract in question would disrupt that endeavor. In pertinent part, the decision is set

forth in the footnote.[4] The defendant concedes that the tract was surrounded, except for one quarter mile sector, by a privately owned tree farm and that the tract had no road connection with adjacent Government land. It would also appear that it might be impractical, because of the mountains and the streams, to build a road connecting the tract with other BLM land.

Plaintiff appealed the decision and, as part of the appeal, filed an affidavit in which he committed himself to enter a cutting program consistent with a sustained yield program, in the event he was granted the land.[5]

During the course of the initial appeal, the Department, on March 9, 1962, offered to exchange the land in question with another lumber company and allow harvesting thereon in return for certain other private lands. The offer, however, was not accepted.

In April, 1963, the Assistant Secretary of the Interior affirmed the decision of the Acting Chief of the Section of the BLM. He found that the land was unsuitable for disposal by scrip location and that the refusal to classify the land as suitable was not based on an error of fact or judgment, but was consistent with the facts and was entirely proper. A motion for reconsideration of the opinion was denied on June 12, 1963. The Assistant Secretary emphasized the provisions of the Taylor Grazing Act which authorized the Secretary, in his discretion, to examine and classify lands which

---

1. 17 Stat. 649.

2. 10 Stat. 849.

3. 12 Stat. 836.

4. "The tracts lie within the Columbia River Master Unit of the Salem, Oregon, District, and are administered, together with additional acreage of commercial forest land under an intensive forest management program. The selected tracts are a vital and integral part of the forest lands of the management unit and loss of these lands would disrupt the forest management program."

5. " * * * I am willing to enter into an agreement with the United States, running with the land, as a condition of the approval of my four applications and the issuance to me of patents for the quarter section involved, in which I will agree to a cutting program on the land consistent with sustained yield, the details of which agreement are to be worked out between the appropriate officials and myself and the agreement is to be subject to official approval before the application are finally approved and patents issued."

are proper for acquisition in satisfying any outstanding scrip rights.[6]

## JURISDICTION

The plaintiff urges jurisdiction under the Administrative Procedure Act, 5 U.S. C. § 1009 and under the Court's general powers of equity. It is his claim that defendant ignored the instructions of Congress embodied in the statutes and attempted to substitute his arbitrary and capricious decision for the will of Congress.

■ Defendant takes the position that the classification for disposal of parcels of the public domain, for which plaintiff made application, is a matter committed by law to agency discretion, and thus, exempted from judicial review. Moreover, the Secretary argues that this action is, in fact, against the United States and since the Government has not consented to be sued, the action should be dismissed for want of an indispensable party. The precise jurisdictional issue on the right of this Court to review the decision of the Secretary was before me in Linn Land Co. v. Udall, 255 F.Supp. 382 (D.Or.1966), in which I expressed grave doubts as to the Court's jurisdiction to review the action of the Secretary in classifying the lands.[7] I remain of the same belief. The Ninth Circuit decisions in Adams v. Witmer, 271 F.2d 29 (9th Cir. 1959) and Coleman v. United States, 363 F.2d 190 (9th Cir. 1966), cited by plaintiff, relate to mining claims. Such cases involve property rights "in the fullest sense" in specific property, rather than the "floating" scrip rights of plaintiff. More closely in point are Pease v. Udall, 332 F.2d 62 (9th Cir. 1964); Thor-Westcliffe Development Co. v. Udall, 114 U.S.App.D.C. 252, 314 F.2d 257 (1963); and Haley v. Seaton, 108 U.S.App.D.C. 257, 281 F.2d 620 (1960). Although these cases grew out of the Mineral Leasing Act, the Secretary's discretionary powers are almost identical with those he possesses under the Taylor Grazing Act.

■ Moreover, I remain of the belief that the Court has no jurisdiction under its general equity power. The United States, being the owner of the land, would be an indispensable party, and failure to join the United States would leave the Court without jurisdiction. F.R.Civ.P. 12(b) (7) and 12(b) (1).

## MERITS

Be that as it may, the likelihood of an appeal in this case warrants an expression of my views on the merits.

Treating the case as a review of the Secretary's decision under the provisions of 5 U.S.C. § 1009, I shall proceed with an analysis of the record.

The controlling provision of the Taylor Grazing Act is 43 U.S.C. § 315f, which provides, among other things, that if public lands are "more valuable or suitable for *any other use* than for [grazing]" they may be classified for such use. The phrase "any other use", as used in the statute, creates a separate and distinct category which may include lands which were otherwise proper for scrip selection. This construction is entirely consistent with the conservative purposes of the Act. Carl v. Udall, 114 U.S.App.D.C. 33, 309 F.2d 653 (1962); Linn Land Co. v. Udall, supra. At the outset, I find that there was nothing in the agency action, findings or conclusions, which is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege or immunity; (3) in excess of statutory jurisdiction, authority or limitations or short of statutory right; (4) without observance of procedure required by law.

There remains the issue of whether the action, findings and conclusions of the Secretary are supported by substantial evidence or are warranted by the facts to the extent that the facts are subject to trial *de novo* by this Court. Many of the facts have been stated in the forepart of this opinion.

---

6. 43 U.S.C. § 315.

7. 43 U.S.C. § 315 and 5 U.S.C. § 1009.

■■ That the agency made a careful study of the timber on the tract selected by plaintiff and the relationship of that timber to the allowable annual cut in terms of board feet is clearly demonstrated by the "classification narrative" of the Lands Officer as set forth in the footnote.[8] Likewise, the evidence shows that the tract selected by plaintiff was a vital and integral part of the Columbia River Master Unit. There is substantial evidence that the loss of this tract would disrupt the Forest Management Program in that particular unit. The fact that plaintiff offered to negotiate an agreement with the BLM whereby he would agree to cut timber on the tract on a sustained yield basis, with a provision that the agreement would "run with the land", is beside the point. The actions of the Secretary are not controlled by offers or counteroffers of members of the public. Furthermore, the evidence discloses that any harvesting on the particular tract would increase the allowable cut for the entire unit and even if allowed on a "sustained yield basis", the Secretary would be reducing the permissive cut in the unit. Thus, there was an important reason why Shaw's application was rejected, despite the fact that he had offered to enter into a "sustained yield" agreement. Plaintiff argues that the Secretary's offer to trade the tract to a lumber company for other land, demonstrates that the Secretary was not interested in the conservation of this particular resource, but simply wanted to retain the land so as to trade it at a future date, is, likewise, without value. The tract in question is somewhat isolated and proper supervision creates some difficulties. It was nothing more than good business judgment on the part of the Secretary to effect, if he could, a consolidation of the Government's timber land. That the Secretary may have wanted to trade the land does not mean that his conservation aims would be altered. Although it is quite apparent that the Department of the Interior was encouraging the satisfaction of all outstanding Government obligations and, through its directives, indicated that scrip selections would be handled expeditiously and with favor, and that before purchasing the scrip in question, the plaintiff's attorney had several conferences with the BLM representatives and that they indicated that the tract in question was suitable for scrip selection, those facts do not compel findings in favor of plaintiff. Plaintiff does not go so far as to urge that defendant should be estopped, on this ground, but urges that these actions show that the tract in question should not have been classified as it was. Of course, the employees of BLM could not estop the Secretary. Furthermore, it seems that a simple inquiry by the plaintiff before he purchased the scrip

8. "The lands applied for comprise four 40-acre tracts of public domain forest lands supporting fully stocked stands of saw timber 70 years in age, aggregating 6,000,-000 board feet of saw timber valued at $116,165 for land and timber. The tracts lie within the Columbia River Master Unit of the Salem, Oregon, District, and are administered together with an additional 20,251 acres of commercial forest land under an intensive forest management program. One provision of the forest management program is the regulated annual harvest cutting equal to annual growth of saw timber stands which will result in a sustained production of saw timber from the Columbia River Master Unit upon completion of the cutting cycle. The present volume of the regulatory harvest cut for the public domain forest lands is 11,500,000 board feet per year. The selected tracts are a vital and integral part of the forest lands of the management unit and the loss of these lands would disrupt the forest management program. Exclusion of the tracts from consideration in the management plan will reduce the growth for the master unit 4,100,000 board feet. This volume would be in addition to the present stand volume of 6,000,000 board feet and represents growth which would accrue to the time of the scheduled regulatory cut. Thus the loss of these lands would result in the reduction of the regulatory cut by 115,000 board feet annually. Moreover, losses of given age classes as the result of the reduced allowable cut would compound already existing imbalances in the distribution of critical age classes."

would have disclosed that the tract he selected contributed to the allowable cut in the unit in which it was located. I do not believe that plaintiff was actually misled by any of the representations of the employees of the Bureau.

■ The expertise of the Secretary in the field of classification of these lands is such that it should not be disturbed by the Courts if his decision is supported by substantial evidence. The action of the Secretary, on the record before me, is supported by substantial evidence and is warranted by the facts. On the facts, I would affirm the decision of the Secretary.

The judgment of the Secretary should be affirmed.

It is so ordered.