Hillin L. ARNOLD et al.,
Plaintiffs-Appellants,

v.

Rogers C. B. MORTON, the Secretary of Interior of the United States, et al., Defendants-Appellees.

No. 74–2218.

United States Court of Appeals,
Ninth Circuit.

Jan. 23, 1976.

John D. Zeglis (argued), of Sidley & Austin, Chicago, Ill., for plaintiffs-appellants.

Jacques B. Gelin, Atty. (argued), U. S. Dept. of Justice, Washington, D. C., for defendants-appellees.

## OPINION

Before DUNIWAY, TRASK and SNEED, Circuit Judges.

SNEED, Circuit Judge.

This case reaches us on appeal from the district court's order granting the motion of the defendants for summary judgment. The case arises from a rejection by defendant Secretary of the Interior of plaintiffs' applications for oil and gas leases under the Mineral Lands Leasing Act[1] on lands that are within the exterior perimeter of Naval Petrole-

---

1. 30 U.S.C. §§ 181–287. Section 226 of Title 30 provides in pertinent part:

§ 226. *Lease of oil and gas lands—Authority of Secretary.*

(a) All lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits may be leased by the Secretary.

\* \* \* \* \* \*

*Lands not within geologic structure of a producing oil or gas field; first qualified applicant.*

(c) If the lands to be leased are not within any known geological structure of a producing oil or gas field, the person first making application for the lease who is qualified to hold a lease under this chapter shall be entitled to a lease of such lands without competitive bidding. Such leases shall be conditioned upon the payment by the lessee of a royalty of 12½ per centum in amount or value of the production removed or sold from the lease.

um Reserve No. 4 (Pet. 4). The Interior Board of Land Appeals held that the Secretary did not have jurisdiction to issue the leases because the lands in question had been made a part of Pet. 4 and therefore were under the control of the Navy. *Starling Brokers,* 6 IBLA 237 (1972). Plaintiffs' action below sought a review of the agency determination[2] and a decision by the district court that they are entitled as a matter of law to the leases for which they applied. We agree with plaintiffs that the lands in question are not a part of Pet. 4, but do not agree that plaintiffs are entitled to leases as a matter of law. We, therefore, reverse the lower court's order granting the Secretary's motion for summary judgment and remand these proceedings to that court with instructions to order the Secretary to consider plaintiffs' lease applications in the light of this Opinion.

I. *Naval Petroleum Reserves and The Mineral Lands Leasing Act.*

In the years following the turn of the century it became increasingly apparent that petroleum was to be the fuel of the future. The Government undertook to discover which lands in the public domain probably contained oil and to withdraw these public lands from those upon which entry was allowed and a claim could be staked out. History of Naval Petroleum Reserves, S.Doc. No. 187, 78th Cong., 2d Sess. 1–2 (1944). Four specific reservations were made for the Navy.[3] Naval Petroleum Reserve No. 4 is located in Alaska. It is an area of some 35,000 square miles in the northern·part of the state. It was created by an Executive Order of President Harding signed on February 27, 1923. Exec.Order No. 3797–A. Initially the Naval Petroleum Reserves remained under the control of the Secretary of the Interior. In 1920,

however, Congress enacted a statute which required the Navy to "take possession of all properties within the naval petroleum reserves as are or may become subject to the control and use by the United States for naval purposes, and on which there are no pending claims or applications for permits or leases under [the Mineral Leasing Act of 1920]." Act of June 4, 1920, c. 228, 41 Stat. 813.[4]

The Mineral Lands Leasing Act, 30 U.S.C. §§ 181–287, allows the Secretary of the Interior to lease lands which have or are thought to have oil and gas deposits. If the land involved is, like the land plaintiffs seek to lease, not within any known geologic structure of a producing oil or gas field, the first qualified applicant is entitled to a lease. 30 U.S.C. § 226(c).[5] Plaintiffs' applications were apparently the first by qualified applicants due to the fact that prior claims on the lands had expired by operation of law or had otherwise been terminated.

II. *The Scope of Naval Petroleum Reserve No. 4.*

Plaintiffs contend that when Pet. 4 was created certain islands of land within the exterior perimeter of the Reserve were excluded from the withdrawal. In Exec.Order No. 3797–A President Harding "set apart as a Naval Petroleum Reserve all of the public lands within the following described area *not now covered by valid entry, lease or application* . . . [there followed a description of the land]." (Emphasis supplied) Plaintiffs contend that the italicized language was intended to exclude from Pet. 4 all lands meeting its terms. The Secretary, on the other hand, claims that all lands within the exterior perimeter were included in the Reserve and that upon expiration of any then existing rights on land within the exterior perimeter the

---

**2.** Jurisdiction for judicial review of the agency action lies under 5 U.S.C. §§ 701–706.

**3.** Elk Hills, California (Reserve No. 1) and Buena Vista Hills, California (Reserve No. 2) were established by President Taft on September 2, 1912 and December 13, 1912, respectively. Reserve No. 3 (Teapot Dome) was located in

Wyoming and created by President Wilson on April 30, 1915. The origins of Pet. 4 are given in the text.

**4.** The current statutory authority for the Navy's control of the Naval Petroleum Reserves is 10 U.S.C. § 7421.

**5.** *See* note 1, *supra.*

land covered by those rights was withdrawn.

■ At the outset we state that the words of the Executive Order ought to govern if they are clear. Administrative practice is no authority when that practice is contrary to law. Since we find the language of the Executive Order read in the light of the case law to be compelling, we have no occasion to pass on the contention of the Secretary that he has continuously dealt with Pet. 4 as if it contained no islands of land under his jurisdiction. *Fairbank v. United States,* 181 U.S. 283, 308–11, 21 S.Ct. 648, 45 L.Ed. 862 (1901); *United States v. Alger,* 152 U.S. 384, 14 S.Ct. 635, 38 L.Ed. 488 (1894); *United States v. Tanner,* 147 U.S. 661, 13 S.Ct. 436, 37 L.Ed. 321 (1893).

■ The language used to create Reserves No. 1 and No. 2 differs from that which was used in the Executive Order which created Pet. 4. In establishing the former, President Taft withdrew "all lands included in [areas are described] . . . *subject to valid existing rights.*"[6] (emphasis supplied.) The plaintiffs contend that the natural interpretation of the words used in creating Pet. 1 and Pet. 2 is that the whole of the area within the exterior perimeter is included pending the expiration of pre-existing claims on a part of the land. When this language is contrasted with the language used in Exec.Order No. 3797–A, plaintiffs argue that it is clear that Exec. Order No. 3797–A sought to leave islands of public land within the Reserve. The Secretary, on the other hand, claims that these language differences are mere technical variations in word usage which are of no substantive importance.

Even without more, we find the plaintiffs' argument appealing. The "not now covered" language of Exec.Order No. 3797–A does not seem to connote an intent for the property to revert, while "subject to" does indicate such an intent. There is, however, more. In *Navajo In-*

*dian Reservation,* 30 L.D. 515 (1901), the Secretary drew the distinction between a savings clause, which merely protects valid prior claims, and an exception to the withdrawal, in a case which presented an issue parallel to the one we face. The question was whether an order creating an Indian Reservation attached as soon as valid rights existing at the creation of the reservation were extinguished or were tracts which had claims upon them excepted from the Reservation. The Secretary decided in *Navajo* that the language used was an exception to the creation of the reservation and thus the lands upon which there had been valid claims "never became a part of the reservation but remained and are a part of the public domain." *Id.* at 519. After noting that some Indian reservations had been created with savings clauses and others with an exception to a withdrawal, the Secretary concludes that "it is fair to presume that the change of language was made for a purpose, and that it was supposed and intended that such provisions should have different meanings." *Id.* at 518–19.

In Solicitor's Opinion, 55 I.D. 205 (1935), it was stated that the phrase "subject to existing valid rights", when used in the context of a withdrawal of land from certain forms of disposition, was an indication that all of the land within the exterior boundary of the designated area was included in the withdrawal. If the area was not *all* included in the withdrawal there would be no need to make the withdrawal "subject to valid existing rights." *Id.* at 208. President Harding's Executive Order No. 3797–A does not use this language, which would have been appropriate had he intended to withdraw the whole area into the Naval Petroleum Reserve.

We agree with plaintiffs that *James F. Rapp,* 60 I.D. 217 (1948) and *Emma H. Pike,* 32 L.D. 395 (1904) are inapposite. Both cases discuss what the legal result is when private rights expire upon land which is admittedly within the scope of a

---

6. Order of Withdrawal, Naval Petroleum Reserve No. 1 (Sept. 2, 1912); Order of Withdrawal, Naval Petroleum Reserve No. 2 (Dec. 13, 1912) (neither order has been published).

withdrawal. "It is well-settled that an executive order creating a reservation for a public purpose, and embracing land covered by a *prima facie* valid entry, will take effect if the entry is subsequently cancelled." *Id.* at 397. However, as plaintiffs point out in their brief, in neither *Pike* nor *Rapp* was there any question raised as to which lands were covered by the order of withdrawal. But this is precisely the question here.

From these authorities the conclusion is inescapable that within the Department of Interior there has existed since at least 1879 an awareness of the distinction between withdrawals which included all tracts within designated exterior lines and those which excluded one or more islands within such exterior lines. Moreover, these sources indicate that, while withdrawals without regard to their language could not extinguish existing rights derived from previous appropriations,[7] total inclusion generally was achieved by use of a description of the exterior lines accompanied by language expressing the thought in one way or another that the withdrawal was subject to valid existing rights. On the other hand, the exclusion of tracts within exterior lines was evidenced by reasonably explicit language. While the language of Exec.Order No. 3797–A is not as explicit as that in *Navajo Indian Reservation, supra,*[8] or as it might be, it is plainly unlike that used in the Orders creating Reserves No. 1 and No. 2 as well as that generally used to indicate total inclusiveness. We must presume that this difference was intended to serve a purpose and we believe the purpose was to exclude from Pet. 4 those tracts "now covered by valid entry, lease or application."

We, therefore, conclude that the Secretary of the Interior did have jurisdiction over the lands in question.

### III. The Remedy.

The Supreme Court's decision in *SEC v. Chenery Corp.,* 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943), allows us to sustain an agency decision only on the grounds set forth by the agency in support of that decision. In this case the Secretary rejected plaintiffs' applications for the reason that he lacked jurisdiction. Since we have concluded that this is incorrect it is necessary for us to remand the case to the Secretary for a decision on plaintiffs' applications which is premised upon a proper view of the question of jurisdiction.

We reject the Secretary's position that *NLRB v. Wyman-Gordon,* 394 U.S. 759, 766–67 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709, allows us to affirm. The "exception" to *Chenery* allowed there was based upon subjective certainty by the Supreme Court with respect to the outcome of the agency decision upon remand. There is no such certainty in this case. While we may seriously doubt that the plaintiffs will obtain a lease, we cannot say that we are certain about this. The Secretary presumably never decided any of the issues which determine whether or not a lease application will be accepted. He must be afforded the opportunity to consider these issues.

We also reject plaintiffs' contention that this court should issue an order directing the Secretary to give plaintiffs the leases they request. It is quite evident that the Secretary has no obligation to issue any lease on public lands. In *Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965), the Supreme Court said that even though the Mineral Lands Leasing Act "directed that if a lease were issued on such a tract, it had to be issued to the first qualified applicant, it left the Secretary discretion to refuse to issue any

---

7. *Wilcox v. Jackson,* 38 U.S. (13 Pet.) 498, 513, 10 L.Ed. 264, 271 (1839).

8. The language of the withdrawal in *Navajo* is as follows:

   [certain described lands are withdrawn as an Indian Reservation] *Provided,* that any tract

or tracts within the region of country described as aforesaid which are settled upon or occupied, or to which valid rights have attached under existing laws of the United States prior to the date of this order, are hereby excluded from this reservation.

lease at all on a given tract." *See also, Burglin v. Morton,* 527 F.2d 486 (9th Cir. 1976). A mere application for a lease vests no rights in the applicant, *Haley v. Seaton,* 108 U.S.App.D.C. 257, 281 F.2d 620 (1960), except the right to have the application fairly considered under the applicable statutory criteria. *Schraier v. Hickel,* 136 U.S.App.D.C. 81, 419 F.2d 663, 667 (1969). But even where an application for a lease is both first in time [9] and filed in response to a government notice that it will receive offers, no legal claim against the Government arises. *Id.* The result is the same where offers were filed long before a determination by the Secretary not to lease. *McDade v. Morton,* 353 F.Supp. 1006 (D.D.C. 1973), *aff'd,* 161 U.S.App.D.C. 237, 494 F.2d 1156 (1974). The plaintiffs cannot bind the Secretary when it was the clear intent of Congress to give him discretion.[10]

A final word should be said about the numerous public land orders [11] which were issued subsequent to the plaintiffs' date of application for leases. Plaintiffs argue that these cannot be dispositive of the case before us because they were issued after the time when plaintiffs would have had their leases but for the Secretary's mistake of law. We agree that these orders are not dispositive of the case, but, as we have made clear, we reject the notion that plaintiffs would have obtained leases but for the question of jurisdiction. The fact that the Secretary made a mistake of law does not raise plaintiffs' hope or expectation of a lease to a vested right. The Secretary is free upon the remand to grant or refuse to grant leases to plaintiffs upon any ground which would have been within his discretion at the time of plaintiffs' filing.[12] Moreover, while he may not refuse to grant a lease on the basis of the later public land orders per se, it would clearly be appropriate to consider whether the factors which led to the issuance of those orders also indicate that it is not in the public interest to lease the lands in question at this time.

Reversed and remanded.

DUNIWAY, Circuit Judge (dissenting):

I dissent. I have considerable doubt about the construction given to Executive Order No. 3797–A in Part II of Judge Sneed's opinion. That construction appears to me to be unnecessarily technical and inconsistent with the purpose of establishing Pet. 4. We were told by the Supreme Court, shortly after Pet. 4 was created, that "it has been and is the policy of the United States to maintain a great naval petroleum reserve in the ground." *Pan American Pe-*

---

**9.** We refer here to those cases where leases are sought under 30 U.S.C. § 226(c).

**10.** Typical of the plaintiffs' misunderstanding of the cases on this point is their use of *Southwestern Petroleum Corp. v. Udall,* 361 F.2d 650 (10th Cir. 1966). Plaintiffs cite the case for the proposition that if the Secretary makes an offer to lease then he must lease to the first qualified applicant. We read the case as saying that if the Secretary decides to lease and § 226(c) is applicable then he must lease to the first qualified applicant. It does not say that an offer to lease binds the Secretary to lease the property.

**11.** PLO 5169–5188, 37 Fed.Reg. 5572–5591; PLO 5418, 39 Fed.Reg. 11547. It should be noted that earlier public land orders cited by the Secretary do not deal with the question of what land is within Pet. 4 and hence are not relevant to this case. *See, e. g.,* PLO 3521, 30 Fed.Reg. 271 (1965); PLO 82, 8 Fed.Reg. 1599

(1943). The public land orders which have been cited that do purport to describe Pet. 4 merely quote the geographic description of the exterior boundary given in Exec.Order No. 3797–A and obviously were not intended to dispose of the issue here. *See, e. g.,* PLO 2215, 25 Fed.Reg. 12599 (1960); PLO 1621, 23 Fed.Reg. 2637 (1958). To accept these geographic descriptions as dispositive is tantamount to ignoring the exception clause in the Executive Order creating Pet. 4.

**12.** We do not mean to suggest that the Secretary must go through the mental gymnastics of attempting to make the decision he would have made at the time of application. We mean only that a public land order which was issued at a time when the Secretary was laboring under a mistake of law cannot in and of itself be a proper ground for the exercise of the Secretary's discretion to refuse the leases.

*troleum & Transport Co. v. United States*, 1927, 273 U.S. (1 Pet.) 456, 501, 47 S.Ct. 416, 422, 71 L.Ed. 734. *See also Mammoth Oil Co. v. United States*, 1927, 275 U.S. (2 Pet.) 13, 53, 48 S.Ct. 1, 72 L.Ed. 137. Lacunae within the reserve, not subject to the authority of the Secretary of the Navy, seem to me to imperil that policy. I incline to the view that Executive Order No. 3797–A can be, and should be, read as the Secretary reads it in this case.

But even if Judge Sneed's construction of the Order be accepted, it does not follow that the decision appealed from is wrong. I would hold that the Congress has reserved, as part of Pet. 4, all of those public lands inside its boundaries which, at the date of Executive Order No. 3797–A, were "covered by valid entry, lease or application," effective immediately upon their ceasing to be so covered.

I begin with the Naval Appropriation Act of June 4, 1920, 41 Stat. 812, Ch. 228, which provides, *inter alia:*

. . . That the Secretary of the Navy is directed to take possession of all properties within the naval petroleum reserves as are or may become subject to the control and use by the United States for naval purposes, and on which there are are no pending claims or applications for permits or leases under the provisions of [the Mineral Leasing Act] or pending applications for United States patent under any law; . . . .

When this statute was enacted, Pet. 4 had not been created, and it can be argued that the statute did not apply to Pet. 4 when it was later created, on two grounds. One is that, as a rider to an appropriation act, it was not a permanent enactment. The other is that the reference to "the naval petroleum reserves" can only be to Pets. 1, 2 and 3, the only reserves which were then in existence. I would reject both arguments. First, the Congress evidently regarded this part of the Act as permanent legislation; it became Section 524 of Title 34 of the United States Code

when the Code was enacted by the Sixty-ninth Congress in 1926. Act of June 30, 1926—Public No. 440, Ch. 712. See 1–7 U.S.C., 1970 ed. p. LXIX. It has been retained and several times amended ever since. Second, the language of the statute speaks to the future: "all properties within the naval petroleum reserves as *are or may become* subject to the control and use by the United States for naval purposes." (emphasis added) The lands here in question did, after Pet. 4 was created, "become subject to the control and use by the United States." I would read the Act as if there were a comma after "United States." Thus the phrase "for naval purposes" refers to the purpose for which "the Secretary of the Navy is directed to take possession;" it is not a limitation upon the Act's definition of the lands of which he is to take possession. The only such limitation is the word "within," and I would read that to mean "within the boundaries of," not "which are a part of." How else is "within" to be reconciled with "as are or may become"?

Even if I am wrong about the applicability of the Act of June 4, 1920, to Pet. 4, later enactments seem to me to make it applicable. By the Act of June 30, 1938, 52 Stat. 1252, Ch. 851, the Congress amended the pertinent part of the Appropriations Act of 1920 "so as to read as follows:" The amended Act, thus adopted, is, so far as pertinent, the same language quoted above, except in one key respect; it eliminates the language "and on which there are no pending claims or applications for permits or leases under [the Mineral Leasing Act] or pending applications for United States patent under any law." The omission of this language is to me highly significant. Until the 1938 amendment, it might be argued that the lands here in question fell outside the authority conferred upon the Secretary by the Act of 1920 because, when Pet. 4 was created, they were lands on which there were "pending claims or applications for permits or leases . . . or pending applications for United States patent . . . " and so not a part of the reserve. After the

1938 amendment, which eliminates this exception, the language "which are or may become subject to the control and use by the United States" fits the lands involved in this case precisely, and there is no longer any statutory language upon which a contrary argument can be built. To me, the 1938 amendment makes it clear that "within" means "within the boundaries of," and does not limit the jurisdiction of the Secretary of the Navy to those lands only that, under Judge Sneed's construction of Executive Order No. 3797–A, were originally set aside as part of the Pet. 4 reserve.

In 1944, the Act of 1920, as embodied in 34 U.S.C. § 524, and amended in 1938, was again amended. The amending Act (Act of June 17, 1944, 58 Stat. 280, Ch. 262) contains language identical to that of the 1938 Act, so far as pertinent here. Again, in 1956, the statute was amended by P.L. 1028, 84th Cong. Ch. 1971, 2d Sess., August 10, 1956, 70A Stat., which enacted a new Title 10 U.S.Code. Former Title 34 § 524 was repealed (70A Stat. 603), and 10 U.S.C. § 7421 was enacted (70A Stat. 457–8). The same language was reenacted, but with one change, which I find significant. The phrase "within the naval petroleum reserves" was amended to read "inside the naval petroleum reserves." [1] Presumably, the change from "within" to "inside" was intentional. I think that it was to make it even more clear that Congress was referring to lands inside the boundaries of the reserves, not limited, if there had previously been such a limitation (which, as I have explained, I do not believe) to those public lands not impliedly excluded from the reserve by Executive Order No. 3797–A. It does not comport with the statute to say that the lands thus excluded never thereafter came to be "within" the reserve, or "inside" the reserve, even though they had long since ceased to be lands of the type impliedly excluded by the Executive Order. Thus the lands here in question are and have long been under the jurisdiction of the Secretary of the Navy.

In my opinion, the Interior Board of Land Appeals correctly held that the Secretary of the Interior has no jurisdiction of the lands in question.

I would affirm.

---

1. The statute was again amended in 1962 (P.L. 87–796, 76 Stat. 904) without material change. The word "inside" was retained.