## SHIVER v. UNITED STATES.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE
FIFTH CIRCUIT.

No. 548. Submitted October 15, 1895. — Decided November 11, 1895.

Land, duly and properly entered for a homestead, under the homestead laws of the United States, is not, from the time of entry, and pending proceedings before the land department, and until final disposition by that department, so appropriated for special purpose, and so segregated from the public domain as to be no longer lands of the United States within the purview and meaning of section 2461 of the Revised Statutes of the

United States; but, on the contrary, it continues to be the property of the United States for five years following the entry, and until a patent is issued.

Where a citizen of the United States has made an entry upon the public lands of the United States under and in accordance with the homestead laws of the United States, which entry is in all respects regular, he may cut such timber as is necessary to clear the land for cultivation, or to build him a house, outbuildings, and fences, and perhaps may exchange such timber for lumber to be devoted to the same purposes; but he cannot sell the timber for money, except so far as it may have been cut for the purpose of cultivation; and in case he exceeds his rights in this respect, he may be held liable in a criminal prosecution under section 2461 or section 5388 of the Revised Statutes of the United States, or either of said sections, for cutting and removing, after such homestead entry, and while the same is in full force, the standing trees and timber found and being on the land so entered as a homestead.

In holding that, as between the United States and a homestead settler, the land is to be deemed the property of the former, at least so far as is necessary to protect it from waste, the court is not to be understood as expressing an opinion whether, as between the settler and the State, it may not be deemed to be the property of the settler, and therefore subject to taxation.

SHIVER was tried upon an information filed in the District Court for the Southern District of Alabama for cutting and removing two hundred pine trees from a quarter section of land in Monroe County, which he had entered as a homestead on January 26, 1894. It appeared that the cutting began about the first of April, and that all the standing timber, amounting to about five hundred trees, had been, either before or after complaint was made against him, cut and removed from the land; that the defendant and his family were living on the land, and had erected a box house worth about one hundred dollars; that the lumber was cut and hauled from the land by defendant's procurement; that it had been cut all over the land; that the land cleared amounted to about an acre; that the house was not yet completed; that the timber was taken to the mill of the Bear Creek Mill Company, of which defendant was an employé; that defendant was not living on the land when the cutting began, and that the trees would make upwards of 150,000 feet of lumber; that they were not cut for the purpose of clearing the land for cultivation, and that

such timber was cut within four months after defendant had made his homestead entry; that the trees yielded an aggregate of the sum of $126, while the improvements made upon the land cost $229. The lumber put into the building amounted to 9765 feet.

There was conflicting evidence as to the motives of the defendant in cutting and selling the timber. He claimed that the logs were exchanged for lumber and building material, all of which were put into his improvement; the government claiming that it was cut for the purpose of sale and profit.

The court instructed the jury that defendant had the right to cut timber on his homestead suitable and sufficient to build necessary and convenient houses, fences, etc., for a home, and to have that timber sawed into suitable lumber to make such improvements on his homestead; that he could have exchanged timber for lumber to make such improvements, but only so much as was necessary, and that if he only did this, and did it in good faith, he should be acquitted. On the contrary, that any cutting in excess of the number necessary to make his improvements would be unlawful. That he had no right to cut trees for the purpose of sale for profit, or to pay debts or loans of money, or to pay his expenses, or to buy supplies; in short, he had no right to cut them for sale for any such purpose.

Defendant was convicted, and appealed to the Circuit Court of Appeals, which certified to this court the following questions:

1. Whether lands duly and properly entered for a homestead, under the homestead laws of the United States, are from the time of entry, and pending proceedings before the land department, and until final disposition by that department, so appropriated for special purpose, and so segregated from the public domain as to be no longer lands of the United States within the purview and meaning of section 2461 of the Revised Statutes of the United States?

2. Where a citizen of the United States has made an entry upon the public lands of the United States under and in accordance with the homestead laws of the United States, which

entry is in all respects regular, can such citizen be held liable in a criminal prosecution under section 2461 or section 5388 of the Revised Statutes of the United States, or either of said sections, for cutting and removing, after such homestead entry, and while the same is in full force, the standing trees and timber found and being on the land so entered as a homestead?

*Mr. M. D. Wickersham* and *Mr. J. W. Smith* for plaintiff in error.

*Mr. Assistant Attorney General Dickinson* for defendant in error.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case turns upon the question as to what are "lands of the United States" within the meaning of Rev. Stat. § 2461, providing for the punishment of persons guilty of cutting timber upon such lands other than for the use of the navy. Obviously the question is not whether such lands are so far withdrawn from sale as to be no longer subject to appropriation by any railroad or other person or corporation to which a land grant has been made, but whether they are still so far the property of the United States that the government may protect itself against an unlawful use of them. Indeed, this court has settled by repeated decisions that the claim of a homestead or preëmption entry made at any time before filing a map of definite location of a railway prevents the lands covered by such claim from passing to such railway under its land grant, even though such entry be subsequently abandoned. *Kansas Pacific Railway* v. *Dunmeyer,* 113 U. S. 629; *Hastings & Dakota Railroad* v. *Whitney,* 132 U. S. 357; *Whitney* v. *Taylor,* 158 U. S. 85; *Sioux City &c. Land Co.* v. *Griffey,* 143 U. S. 32. The same principle applies where lands have been reserved for any purpose whatever. *Wilcox* v. *Jackson,* 13 Pet. 498; *Witherspoon* v. *Duncan,* 4 Wall. 210; *Newhall*

v. *Sanger*, 92 U. S. 761; *Kansas Pacific Railroad* v. *Atchison &c. Railroad*, 112 U. S. 414.

While these cases indicate that lands once appropriated to a certain purpose thereby cease to be available for another purpose, there is nothing in them to show that the United States loses its title to such lands by the first appropriation, or that they cease to be the property of the government. Upon the contrary, it was said by this court, as early as 1839, in *Wilcox* v. *Jackson*, 13 Pet. 498, 516, that " with the exception of a few cases, nothing but the patent passes a perfect and consummate title." So, in *Frisbie* v. *Whitney*, 9 Wall. 187, 193, "There is nothing in the essential nature of these acts" (entering upon lands for the purpose of preëmption) " to confer a vested right, or, indeed, any kind of claim to land, and it is necessary to resort to the preëmption law to make out any shadow of such right." In this case, the following extract from an opinion of Attorney General Bates was quoted with approval: "A mere entry upon land, with continued occupancy and improvement thereof, gives no vested interest in it. It may, however, give, under our national land system, a privilege of preëmption. But this is only a privilege conferred on the settler to purchase lands in preference to others. . . . His settlement protects him from intrusion or purchase by others, but confers no right against the government." A number of authorities were cited to the same effect. It was held that it was within the power of Congress to withdraw land which had been preëmpted from entry or sale, though this might defeat the imperfect right of the settler. In the *Yosemite Valley Case*, 15 Wall. 77, the construction given to the preëmption law in *Frisbie* v. *Whitney* was approved, the court observing, p. 88: "It is the only construction which preserves a wise control in the government over the public lands and prevents a general spoliation of them under the pretence of intended preëmption and settlement. The settler being under no obligation to continue his settlement and acquire the title, would find the doctrine advanced by the defendant, if it could be maintained, that he was possessed by his settlement of an interest beyond the control of the government, a convenient protection for any

trespass and waste in the destruction of timber or removal of ores, which he might think proper to commit during his occupation of the premises."

The right which is given to a person or corporation, by a reservation of public lands in his favor, is intended to protect him against the actions of third parties, as to whom his right to the same may be absolute. But, as to the government, his right is only conditional and inchoate. By the homestead act, Rev. Stat. § 2289, certain classes of persons therein specified are entitled to enter a quarter section of land subject to preemption at a certain price, upon making an affidavit of facts, (§ 2290,) before the register or receiver, including in such affidavit a statement that "his entry is made for the purpose of actual settlement and cultivation, and not either directly or indirectly for the use and benefit of any other person." By the act of March 3, 1891, c. 561, § 5, 26 Stat. 1095, 1098, this affidavit is now required to state that the settler " will faithfully and honestly endeavor to comply with all the requirements of law as to settlement, residence, and cultivation necessary to acquire title to the land applied for; that he or she is not acting as the agent of any person, corporation, or syndicate in making such entry, nor in collusion with any person, corporation, or syndicate to give them the benefit of the land entered, or any part thereof, or the timber thereon." By § 2291, no patent shall issue until the expiration of five years from the date of the entry, the settler being required to prove by two credible witnesses that he has resided upon or cultivated the land for such term of five years immediately succeeding the time of filing the affidavit, and that no part of such land has been alienated, except for certain public purposes. By § 2297, if, before the expiration of the five years, the settler changes his residence or abandons the land for more than six months at any time, the lands so entered shall revert to the government; and by § 2301, the settler may, at any time before the expiration of the five years, obtain a patent for the lands, by paying the minimum price therefor, and making proof of settlement and cultivation, as provided by law, granting preemption rights.

From this résumé of the homestead act, it is evident, first, that the land entered continues to be the property of the United States for five years following the entry, and until a patent is issued; second, that such property is subject to divestiture, upon proof of the continued residence of the settler upon the land for five years; third, that meantime such settler has the right to treat the land as his own, so far, and so far only, as is necessary to carry out the purposes of the act. The object of this legislation is to preserve the right of the actual settler, but not to open the door to manifest abuses of such right. Obviously the privilege of residing on the land for five years would be ineffectual if he had not also the right to build himself a house, outbuildings, and fences, and to clear the land for cultivation, and to that extent the act limits and modifies the act of 1831, now embraced in Rev. Stat. § 2461. It is equally clear that he is bound to act in good faith to the government, and that he has no right to pervert the law to dishonest purposes, or to make use of the land for profit or speculation. The law contemplates the possibility of his abandoning it, but he may not in the meantime ruin its value to others, who may wish to purchase or enter it.

With respect to the standing timber, his privileges are analogous to those of a tenant for life or years. In this connection, it is said by Washburn in his work upon Real Property, (1st ed.) vol. 1, p. 108: "In the United States, whether cutting of any kind of trees in any particular case is waste, seems to depend upon the question whether the act is such as a prudent farmer would do with his own land, having regard to the land as an inheritance, and whether doing it would diminish the value of the land as an estate."

"Questions of this kind have frequently arisen in those States where the lands are new and covered with forests, and where they cannot be cultivated until cleared of the timber. In such case, it seems to be lawful for the tenant to clear the land if it would be in conformity with good husbandry to do so, the question depending upon the custom of farmers, the situation of the country, and the value of the timber. . . .

Wood cut by a tenant in clearing the land belongs to him, and he may sell it, though he cannot cut the wood for purposes of sale; it is waste if he does."

By analogy we think the settler upon a homestead may cut such timber as is necessary to clear the land for cultivation, or to build him a house, outbuildings, and fences, and, perhaps, as indicated in the charge of the court below, to exchange such timber for lumber to be devoted to the same purposes; but not to sell the same for money, except so far as the timber may have been cut for the purpose of cultivation. While, as was claimed in this case, such money might be used to build, enlarge, or finish a house, the toleration of such practice would open the door to manifest abuses, and be made an excuse for stripping the land of all its valuable timber. One man might be content with a house worth $100, while another might, under the guise of using the proceeds of the timber for improvements, erect a house worth several thousands. A reasonable construction of the statute — a construction consonant both with the protection of the property of the government in the land and of the rights of the settler — we think restricts him to the use of the timber actually cut, or to the lumber exchanged for such timber and used for his improvements, and to such as is necessarily cut in clearing the land for cultivation.

While this question never seems to have arisen in this court before, in *United States* v. *Cook*, 19 Wall. 591 — a suit in trover for the value of timber cut from an Indian reservation — it was held that while the right of use and occupancy by the Indians was unlimited, their right to cut and sell timber, except for actual use upon the premises, was restricted to such as was cut for the purpose of clearing the land for agricultural purposes; that while they were at liberty to sell the timber so cut for the purpose of cultivation, they could not cut it for the purpose of sale alone. In other words, if the cutting of the timber was the principal, and not the incident, then the cutting would be unlawful, and the timber when cut became the absolute property of the United States. Their position was said to be analogous to that of a tenant for life, the

government holding the title, with the rights of a remainder-man.

In the courts of original jurisdiction, it has been uniformly held that a similar rule applied to homestead entries. *United States* v. *McEntee*, 23 Internal Revenue Record, 368; *United States* v. *Nelson*, 5 Sawyer, 68; *The Timber Cases*, 11 Fed. Rep. 81; *United States* v. *Smith*, 11 Fed. Rep. 487, 493; *United States* v. *Stores*, 14 Fed. Rep. 824; *United States* v. *Yoder*, 18 Fed. Rep. 372; *United States* v. *Williams*, 18 Fed. Rep. 475; *United States* v. *Lane*, 19 Fed. Rep. 910; *United States* v. *Freyberg*, 32 Fed. Rep. 195; *United States* v. *Murphy*, 32 Fed. Rep. 376. This general consensus of opinion is entitled to great weight as authority.

While we hold in this case that, as between the United States and the settler, the land is to be deemed the property of the former, at least so far as is necessary to protect it from waste, we do not wish to be understood as expressing an opinion whether, as between the settler and the State, it may not be deemed the property of the settler, and, therefore, subject to taxation. *Carroll* v. *Safford*, 3 How. 441; *Witherspoon* v. *Duncan*, 4 Wall. 210; *Railway Co.* v. *Prescott*, 16 Wall. 603; *Railway Co.* v. *MacShane*, 22 Wall. 444; *Wisconsin Central Railroad* v. *Price County*, 133 U. S. 496.

As the land in question continued to be "the land of the United States," within the meaning of section 2461,

*The first question must be answered in the negative, and the second in the affirmative.*