ASSINIBOINE & SIOUX TRIBES et al., Appellants,

v.

R. E. NORDWICK et al., Appellees.

No. 20440.

United States Court of Appeals Ninth Circuit.

May 19, 1967.

2. Miles v. City of Wichita, 175 Kan. 723, 267 P.2d 943, 947 (Kan.1954).

**428**

Marvin J. Sonosky, Washington, D. C., John M. Schiltz, Wiggenhorn, Hutton, Schiltz & Sheehy, Billings, Mont., for appellants.

Baxter Larson, Wolf Point, Mont., Charles Luedke, Billings, Mont., for appellees.

Thurgood Marshall, Sol. Gen., Edwin L. Weisl, Jr., Asst. Atty. Gen., Roger P. Marquis, Atty., Lands & Natural Resources Div., Dept. of Justice, Washington, D. C., for the United States.

Before JERTBERG, BROWNING, and ELY, Circuit Judges.

BROWNING, Circuit Judge.

The Act of May 30, 1908 (35 Stat. 558) provided that part of the land composing the Fort Peck Reservation was to be allotted among members of the Assiniboine and Sioux Tribes, and the remainder sold for their benefit. The unallotted lands were to be opened to settlement and entry under the homestead laws at prices to be fixed by appraisal. Homestead entrymen were to be allowed five years to pay the purchase price and seven years to make final proof entitling them to patents. Unallotted lands "remaining undisposed of" five years after the lands were opened to entry were to be sold at auction.

The 1908 Act was amended by the Act of March 3, 1927 (44 Stat. 1401) "specifically reserving to the Indians having tribal rights on said reservation the oil and gas in the tribal lands *undisposed of* on the date of the approval of this Act" (emphasis added); and authorizing the Tribal council to lease the reserved oil and gas deposits.[1]

On January 24, 1925, Nordwick filed a homestead application on a 160-acre tract under the 1908 Act. When the 1927 Act was passed, Nordwick had paid only one fifth of the purchase price, had not satisfied the statutory cultivation requirements (43 U.S.C. § 218(d) (1964)), and had not submitted the required final proofs. 43 U.S.C. § 164 (1964). He completed these requirements in 1929, and received a patent in 1935.

The issue is whether the oil and gas rights in these 160 acres were reserved to the Tribes by the 1927 Act, or passed to Nordwick.

Land remains subject to the disposing power of Congress until a homestead or pre-emption entryman satisfies the conditions imposed by law for issuance of a patent. Russian-American Packing Co. v. United States, 199 U.S. 570, 577, 26 S.Ct. 157, 50 L.Ed. 314 (1905); Shiver v. United States, 159 U.S. 491, 495–496, 16 S.Ct. 54, 40 L.Ed. 231 (1895); Campbell v. Wade, 132 U.S. 34, 38, 10 S.Ct. 9, 33 L.Ed. 240 (1889); The Yosemite Valley Case, 15 Wall. 77, 82 U.S. 77, 87, 21 L.Ed. 82 (1872); Frisbie v. Whitney, 9 Wall. 187, 76 U.S. 187, 195–196, 19 L.Ed. 668 (1869).[2] Congress therefore had power to amend

---

1. Congress provided a comprehensive scheme for leasing oil and gas deposits in public domain lands by the Mineral Leasing Act of 1920, 30 U.S.C. § 181 et seq. (1964). But this Act did not apply to Indian lands. Haley v. Seaton, 108 U.S.App.D.C. 257, 281 F.2d 620, 623 (1960). Leasing of oil and gas deposits on unallotted Indian lands was authorized by the Act of May 29, 1924, 43 Stat. 244, 25 U.S.C. § 398 (1964) (applicable to treaty reservations), and the Act of Mar. 3, 1927, 44 Stat. 1347, 25 U.S.C. § 398(a) (1964) (applicable to executive order reservations). Oil and gas deposits on the Fort Peck Reservation were the subject of the special legislation, also adopted Mar. 3, 1927, 44 Stat. 1401, referred to in the text.

2. Cf. State of Wyoming v. United States, 255 U.S. 489, 497–498, 41 S.Ct. 393, 65 L.Ed. 742 (1921); Ferry v. Udall, 336 F.2d 706 (9th Cir. 1964); Miller v. Udall, 115 U.S.App.D.C. 162, 317 F.2d 573, 576 (1963); Willcoxson v. United States, 114 U.S.App.D.C. 203, 313 F.2d 884, 887–888 (1963); Haley v. Seaton, 108 U.S.App. D.C. 257, 281 F.2d 620, 623–624 (1960).

the 1908 Act to reserve oil and gas deposits in land subject to an unperfected homestead entry. The question is whether Congress intended to do so.

## I

Considerations supporting the conclusion that Congress intended by the 1927 Act to reserve oil and gas deposits in land subject to an unperfected homestead claim may be summarized as follows.

■ 1. In public land law,[3] "disposal" often refers to "that final and irrevocable act by which the right of a person, purchaser, or grantee, attaches, and the equitable right becomes complete to receive the legal title by a patent or other appropriate mode of transfer. Until that act the land is not disposed of * * *." Oregon v. Frakes, 33 L.D. 101, 103 (1904). See also Grant v. Oregon, 2 L.D. 641 (1883); Oil Prospecting Permits in Power Site Reserves, 48 L.D. 459, 462–465 (1921). Under these authorities, tribal lands "undisposed of" would include land subject to an unperfected homestead entry.

2. Because statutes withdrawing tribal lands from further alienation commonly include provisions expressly preserving outstanding but unperfected rights,[4] it may be argued that the omission of such a savings clause from the 1927 Act is to be taken as deliberate.

■ 3. The evident purpose of the Act of 1927 was to further the interests of the Indians [5] by reserving oil and gas deposits to be leased for their benefit.

This purpose would best be served by giving maximum scope to the language of the reservation.

■ 4. In its dealings with Indians the United States "has charged itself with moral obligations of the highest responsibility and trust" (Seminole Nation v. United States, 316 U.S. 286, 297, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942)), and section 13 of the 1908 Act declares that "the United States shall act as trustee for said Indians to dispose of said [unallotted] lands." Cf. Ash Sheep Co. v. United States, 252 U.S. 159, 166, 40 S.Ct. 241, 242, 64 L.Ed. 507 (1920); Hanson v. United States, 153 F.2d 162, 163 (10th Cir. 1946). The language of the amendatory Act of 1927 is to be construed in this context; and there are considerations of equity and fairness which support a broad construction of the oil and gas reservation, and its related authority for leasing the reserved rights. Leasing is a fairer method of realizing the value of oil and gas deposits than permitting them to pass with the surface rights for no additional consideration. Congress was aware of this fact. Leasing was adopted as the exclusive method for disposing of oil and gas deposits in public domain lands by the Mineral Leasing Act of 1920, 30 U.S.C. § 181 et seq. Furthermore, oil and gas deposits in public domain lands subject to homestead entry when the Mineral Leasing Act of 1920 was enacted did not pass to the entryman, but were reserved by the United States to be leased for its own benefit.[6]

---

3. Nordwick argues that public land law is not applicable because the 1908 and 1927 Acts relate to Indian lands rather than lands in the public domain. Public land law authorities are relevant because sections 7 and 8 of the 1908 Act provide that the unalloted lands "shall be disposed of" in accordance with the laws relating to disposition of the public domain, and the 1927 Act is amendatory of the earlier statute.

4. E. g., Act of Aug. 10, 1939, ch. 662, § 1, 53 Stat. 1351, 25 U.S.C. § 463d; Act of July 27, 1939, ch. 387, § 5, 53 Stat. 1129, 25 U.S.C. § 575; Act of June 18, 1934, ch. 576, § 3, 48 Stat. 984, 25 U.

S.C. § 463(a) (1964). Cf. Act of Aug. 15, 1953, ch. 509, § 2, 67 Stat. 592 printed in the historical note following 25 U.S.C. § 611.

5. The Act of 1927 was confined to oil and gas deposits because "the interests of the Indians are cared for under existing law with respect to the proceeds from the sale of their surplus lands, including coal and mineral lands * * *." H.R.Rep. No. 1966, 69th Cong., 2d Sess. (1927). S.Rep. 1632, 69th Cong., 2d Sess. (1927).

6. However, entrymen were granted a preference right to lease oil and gas deposits in their lands (30 U.S.C. § 229 (1964);

It is argued that Congress must have intended to achieve a result no less favorable to the Indians as to oil and gas deposits in lands which the United States held in trust for their benefit.

■ 5. Finally, the Tribes invoke the settled rule of interpretation that "statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians." Alaska Pac. Fisheries v. United States, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918). See also Squire v. Capoeman, 351 U.S. 1, 6–7, 76 S.Ct. 611, 100 L.Ed. 883 (1956); United States v. Santa Fe Pac. R. R., 314 U.S. 339, 354, 62 S.Ct 248, 86 L.Ed. 260 (1941); Maryland Cas. Co. v. Citizens Nat'l Bank, 361 F.2d 517, 521 n. 16 (5th Cir. 1966); Federal Indian Law 566 (G.P.O.1958). A "liberal construction" resolving "doubtful expressions * * * in favor of the Indians" would treat lands subject to unperfected entries as "undisposed of."

## II

Looking to the other side, the following considerations suggest that Congress did not intend to include lands under homestead entry in the phrase "undisposed of" in the 1927 Act, and thus deprive entrymen of oil and gas deposits.

1. The phrase "undisposed of" also appears in section 11 of the Act of 1908,[7] and in this context it concededly does not include lands under entry. This is clear, for Congress could not have intended that lands in the process of acquisition by an entryman should become subject to sale at auction after five years when the statute allowed the entryman seven years to perfect his right to a patent by submitting his final proof—particularly since the price obtainable by auction was less than that obtainable by disposition to the entryman.[8] Accordingly, contemporaneous administrative interpretation of the phrase "undisposed of" in section 11 of the 1908 Act excluded lands under entry. Lands Within Former Fort Peck Indian Reservation. Instructions, 46 L. D. 380 (1918). It can be argued that the same language in the amendatory Act of 1927 was presumably used with the same meaning.

2. Section 9 of the Act of August 1, 1914, 38 Stat. 582, authorized the Secretary of Interior to allot surplus Fort Peck Reservation lands to Indian children in accordance with the Act of 1908 "as long as surplus lands within said reservation remain *undisposed of*." (Emphasis added.) Here again it is conceded that the critical phrase excludes land under entry, for Congress could not have intended to expose entrymen to loss of their unperfected homesteads by allotment.[9]

3. On January 18, 1929, the Commissioner of the General Land Office issued instructions that, "In the future in all

---

Skeen v. Lynch, 48 F.2d 1044, 1047 (10th Cir. 1931)), a right which would not be available in the present situation if the 1927 Act were construed as the Tribes suggest.

7. The pertinent part of § 11 of the 1908 Act reads:
  That all lands hereby open to settlement remaining *undisposed of* at the end of five years from the date of President's proclamation to entry shall be sold to the highest bidder for cash at no less than one dollar and twenty-five cents per acre, under regulations to be prescribed by the Secretary of the Interior * * * (emphasis added).

8. Section 8 of the 1908 Act provided that the homestead price was to be fixed by appraisal at the land's actual value, but in no event at less than $1.25 per acre. The same minimum applied to sale at auction at the end of five years, but sale was authorized at the end of ten years with no minimum.

9. See also meaning ascribed by the Department of Interior to the phrase "not otherwise reserved or disposed of" in the Act of Feb. 27, 1917, 39 Stat. 944, 30 U.S.C. § 87 (1964). Circulars and Regulations of the General Land Office, Jan. 1930, 709–10. We do not agree with the Tribes that this ruling is based upon the ground that a special statute controls over a later general one.

applications for homestead entries of Fort Peck lands or applications for reinstatement of cancelled entries of such lands, you will require the applicant to file a consent to the reservation of oil and gas to the Fort Peck Indians in accordance with" the 1927 Act. Circulars and Regulations of the General Land Office, January 1930, 715–16 (G.P.O.1930). In a subsequent interpretation of these instructions it is said that they "directed that the reservation be made upon future applications, and made no such requirement as to pending unperfected entries at the date of the act, which implies the construction that something less than a complete equitable title and vested right to a patent constituted a disposal under the act." Mineral Reservations in Trust Patent for Allotments to Fort Peck and Uncompoligre Indians, 53 I.D. 538, 544 (1931).[10]

4. A partial survey of Land Office records, submitted to this court by Nordwick and unchallenged by the Tribes, discloses 157 patents issued after 1927 on homestead entries predating the 1927 Act which do not contain a reservation of oil and gas deposits. Only one contrary instance is called to our attention—the initial patent issued to Nordwick in the present case.[11] Moreover, the exclusion of oil and gas deposits from Nordwick's original patent may have resulted from clerical error, and was in fact corrected by issuance of a supplemental patent.[12]

5. Finally, Nordwick suggests two reasons why Congress would have intended to preserve the claim of holders of unperfected homestead entries to the oil and gas deposits in their tracts. First, disposition of the lands to entrymen under the homestead act at the appraised prices was the preferred method, for it resulted in greater return to the Indians.[13] Homestead entrymen would be encouraged to continue on the land and

---

10. In Raymond Bear Hill, 52 L.D. 688, 691 (1929), it was stated that land is "disposed of" for the purposes of the 1927 Act if "it is no longer subject to other disposal or reservation"—a description which might include land under homestead entry. But as the Tribes point out, the language goes beyond the requirements of the case since the claimant was an Indian allottee who had done all the law required of him to perfect his right to a patent. Cf. State of Wyoming v. United States, 255 U.S. 489, 497–498, 41 S.Ct. 393 (1921).

11. Counsel for the Tribes states that one additional application (Karge, G.F. 074447) has been filed asserting a right to oil and gas in a homestead entry, but the circumstances are not disclosed.

12. Nordwick sought patents on two tracts —the 160-acre tract involved in this appeal, and an 80-acre tract on which Nordwick filed an additional homestead application on May 25, 1929, two years after the passage of the 1927 Act. Nordwick was required to sign a waiver consenting to the reservation of oil and gas deposits in the latter tract only, and the Assistant Commissioner of the General Land Office instructed the field office that the oil and gas was to be reserved under the 1927 Act as to this tract. Nonetheless, the final certificate and patent issued by the field office was not drawn in accordance with these instructions but reserved oil and gas in both tracts.

In 1955, twenty years after Nordwick received his patent, the Tribes leased the reserved rights to Carter Oil Company. After a title investigation, that company advised the Department of Interior that it thought the reservation of oil and gas was improper. Nordwick requested the Secretary of Interior to issue a corrected patent. In February 1956 the Department's Field Solicitor ruled that the reservation was proper. The Bureau of Land Management arrived at the opposite conclusion, and submitted a draft decision to that effect to the Assistant Solicitor of the Department. The Assistant Solicitor refused to endorse the draft decision. The Bureau nonetheless issued a corrected patent to Nordwick on May 9, 1956, eliminating the reservation of oil and gas.

13. See note 8. Congressional preference for disposal under the homestead laws is reflected in repeated amendments of the 1908 Act extending the time given homestead entrymen to complete payment of the purchase price of their homesteads. Act of March 2, 1917, ch. 148, 39 Stat. 994–95; Act of Dec. 11, 1919, ch. 4, 41 Stat. 365–66; and the Act of Mar. 4,

complete their payments if they were allowed to retain the oil and gas; they would be discouraged from doing so if they were not. Second, Congress may well have felt that it would be unfair to deny oil and gas rights to prior entrymen who had invested time, effort, and money on the expectation that these rights would be included in their patents.

### III

It would be idle to pretend that the choice between these conflicting indicia [14] of congressional intent is clear; and regrettably in this instance Congress cannot readily correct us if we err.

Except for one factor, we would follow the interpretive guide that doubtful language in Indian legislation is to be resolved in favor of the Indians. The consideration we find compelling in favor of the entryman in this case is the virtually unbroken administrative practice of issuing patents on pre-1927 homestead applications after passage of the 1927 Act without reserving oil and gas rights. This practice seemingly reflects a uniform contemporaneous interpretation of the 1927 Act by persons presumably familiar with its background and purpose, and we are persuaded by it.

■ As the Supreme Court said in a case involving similar circumstances, "Many thousands of acres have been patented to individuals under that interpretation, and to disturb it now would be productive of serious and harmful results. The situation therefore calls for the application of the settled rule that the practical interpretation of an ambig-

uous or uncertain statute by the executive department charged with its administration is entitled to the highest respect, and, if acted upon for a number of years, will not be disturbed except for very cogent reasons." Logan v. Davis, 233 U.S. 613, 627, 34 S.Ct. 685, 690, 58 L.Ed. 1121 (1914). In addition to the authorities cited in Logan, see United States v. Jackson, 280 U.S. 183, 193, 50 S.Ct. 143, 74 L.Ed. 361 (1930); United States v. State of Minnesota, 270 U.S. 181, 205, 46 S.Ct. 298, 70 L.Ed. 539 (1926); Swendig v. Washington Water Power Co., 265 U.S. 322, 331, 44 S.Ct. 496, 68 L.Ed. 1036 (1924); Blanset v. Cardin, 256 U.S. 319, 326, 41 S.Ct. 519, 65 L.Ed. 950 (1921); McLaren v. Fleischer, 256 U.S. 477, 481, 41 S.Ct. 577, 65 L.Ed. 1052 (1921); LaRoque v. United States, 239 U.S. 62, 64, 36 S.Ct. 22, 60 L.Ed. 147 (1915). See generally, Davis Administrative Law, § 5.06 at 324-38 (1958).

■ Accordingly, we conclude that withholding provisions of the 1927 Act did not apply to lands subject to pending but unperfected homestead entries under the 1908 Act.

### IV

■ The district court rejected the 'Tribes' argument that Nordwick was barred by laches and estoppel on the ground that no prejudice appeared,[15] citing Costello v. United States, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). We agree.

Affirmed.

---

1925, ch. 533, 43 Stat. 1267. The auction sales contemplated by the Act of 1908 were in fact never held. The Fort Peck Indians of the Fort Peck Reservation, Montana v. United States, No. 183 (Indian Cl. Comm'n, June 8, 1954).

14. We have omitted contentions based upon generalizations as to the nature of a homestead entryman's claim. Compare Mr. Justice Pitney's statement that an entryman "has a substantial inceptive title" (Knapp v. Alexander Co., 237 U.S. 162, 167, 35 S.Ct. 515, 59 L.Ed. 894 (1915)) with Mr. Justice Brewer's re-

mark that a homestead entry "amounts to nothing more than a declaration of intention." Whitney v. Taylor, 158 U.S. 85, 95, 15 S.Ct. 796, 800, 39 L.Ed. 906 (1895).

15. The Tribes did not raise this issue in their complaint, and it does not appear in the listing of their contentions in the pre-trial order. Rather, it was Nordwick who relied upon estoppel and laches based upon the seven-year lapse between issuance of the supplemental patent to Nordwick and the filing of suit by the Tribes.