In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-3722

BITLER INVESTMENT VENTURE II, LLC, *et al.*,

*Plaintiffs-Appellants*,

*v.*

MARATHON PETROLEUM COMPANY LP, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:04-cv-00477-TLS — **Theresa L. Springmann**, *Judge*.

ARGUED OCTOBER 28, 2013 — DECIDED JANUARY 27, 2014

Before POSNER, WILLIAMS, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. The appeal in this diversity suit governed by Indiana and Michigan law presents issues of contract and property law (the venerable doctrine of waste). The plaintiffs, affiliated real estate firms that we'll pretend are one and call Bitler, sued affiliated oil companies that we'll also pretend are one and call Marathon. Bitler seeks damages for harm caused by Marathon in attempting to clean up pollution at gas stations that Bitler had leased to it.

According to Bitler's law firm, the suit sought more than $9 million in damages. "Beckman Lawson, LLP Announces Complaint Filed Against Marathon Ashland Petroleum, LLC," *Business Wire* (2004), www.businesswire.com/news/ home/20041217005529/en/Beckman-Lawson-LLP-Announces-Complaint-Filed-Marathon#.UuarIbTna70 (visited Jan. 27, 2014). Later its expert witness estimated Bitler's damages at $17.4 million. But the final judgment was for only $269,000, and Bitler appeals.

The leases, all signed in 1983, were for eleven years, but Marathon had an option to renew for another ten. Eight of the leased properties (all in either Indiana or Michigan) are at issue in this appeal.

In the late 1980s the Environmental Protection Agency adopted new regulations concerning pollution from underground storage tanks for gasoline and other petroleum products; the storage tanks that Bitler had leased to Marathon were underground. The regulations required that the tanks and their pipes be removed, upgraded, or replaced by December 1998. 40 C.F.R. § 280.21(a). Bitler and Marathon agreed to remove the tanks, and so the gas stations had to be closed, as they couldn't sell gasoline without a place to store it, and no arrangements had been made to replace the underground tanks with above-ground ones. All the gas stations were closed in the 1990s.

The leases had had to be adjusted in light of the unforeseen adverse development (the new regulations), and in 1992 the parties agreed to what they called a "Master Amendment to Leases." The amendment transferred ownership of the underground tanks to Marathon and made it "fully responsible for removing" the tanks and pipes, filling

the holes created by the removal, complying fully with all environmental laws, "leav[ing] the Premises in a condition reasonably useful for future commercial use," and thus "re-plac[ing] any asphalt, concrete, or other surface, including landscaping, which is damaged or destroyed during the tank and pipe removal operation." Marathon also agreed to "re-turn the Premises to [Bitler] as nearly as possible in the same condition as it was in prior to such remediation work," and to be responsible "for any and all liability, losses, damages, costs and expenses resulting from [Marathon's] use of the Premises and the removal of the underground storage tanks and piping," and, with an immaterial exception, to continue paying rent at the rates specified in the leases.

Although stripped of their underground tanks, the prop-erties can be restored as gas stations with above-ground storage tanks, and may well be suitable sites for other com-mercial outlets as well, such as fast-food outlets, because gas stations tend to be strategically located in relation to auto-mobile traffic. For a time Marathon used one of the proper-ties as a tobacco shop.

Bitler advances both a breach of contract claim and a waste claim with regard to each of the eight properties in contention. The district judge rejected all the contract claims on summary judgment, along with the waste claims relating to two of the Michigan properties, located in Adrian and Michigan Center respectively. The other six waste claims went to trial before a jury, and Bitler prevailed. But the judge refused to award double damages for waste, sought by Bitler pursuant to a Michigan statute, with regard to the four properties (of the six) that were in Michigan. See Mich.

Comp. Laws § 600.2919(2)(a). We begin with the contract claims.

Bitler leads with its weakest argument—that the indemnity clause that we quoted from the Master Amendment required Marathon to pay for any damage to the properties during the cleaning up of the pollution. That's not correct. The Master Amendment requires Marathon to *indemnify* Bitler for liability that Bitler might have to third parties as a consequence of Marathon's remediation activities. The next paragraph of the Master Amendment describes the amendment as "this Agreement to indemnify, defend, and hold [Bitler] harmless." And the paragraph after that requires, just as in an insurance contract—of which an indemnity agreement is a form—that Bitler notify Marathon "of any act or occurrence involving a liability, claim, demand, or costs indemnified against herein," within a specified time "after the occurrence of such act or occurrence shall have come to [Bitler's] knowledge."

Bitler's stronger claim of breach of contract is based on the requirements in the Master Amendment that Marathon "leave the Premises in a condition reasonably useful for future commercial use," including repairing surface damage from the removal of the tanks and piping, and "return the Premises to [Bitler] as nearly as possible in the same condition as it was in prior to such remediation work." These provisions might seem to require Marathon to rebuild the gas stations, complete with the installation of new underground storage tanks. Obviously this was not contemplated. Otherwise the Master Amendment would not have required Marathon to fill the holes created by removing the underground storage tanks; for to restore the property to its origi-

nal condition Marathon would have had to redig the holes in order to install new underground tanks, which was never contemplated. Presumably therefore "premises" refers to the surface of the properties, not the underground.

But if as Bitler alleges Marathon made an inexcusable mess in "remediating" the properties, so that without great expense they could not be restored to *any* commercial use, then it violated the provisions of the Master Amendment that we quoted. Bitler argues that through failure to make simple repairs Marathon allowed the buildings on two of the Michigan properties—the ones in Adrian and Michigan Center—to collapse, and left them to rot where they fell, to be condemned (and they were) by local government as unsafe, abandoned eyesores. The judge, rejecting both the contract claims and the waste claims relating to these properties, said that Bitler had "consented" to the removal of the buildings. But it had had no choice; as we said, they had been condemned. Bitler's contract and waste claims concerning these buildings should not have been dismissed.

Bitler's further claim, for what it calls "delay damages" resulting from alleged breaches, fails. It argues that Marathon took an unconscionable time to complete the remediation that it was required to do, thus improperly depriving Bitler of timely opportunities to put the remediated properties to new commercial uses. Yet pursuant to the Master Amendment Marathon continued paying the rent specified in the original leases. Since it was earning no money from the properties during the remediation period, the obligation to pay rent was a spur to its completing the remediation. More important, had the parties meant to fix a deadline for remediation they would have said so in the Master Amend-

ment, rather than leaving it to a court to determine what is undue delay in completing an environmental clean-up. The fact that no deadline is specified in that otherwise very detailed agreement indicates that the continued rental was intended as a substitute for a deadline, much as when liquidated damages in the form of so much per day, week, or month for missing a contractual deadline are specified as *the* remedy for delay. See Note, "No (Easy) Way Out: 'Liquidating' Stipulated Damages for Contractor Delay in Public Construction Contracts," 44 *Duke L.J.* 357, 357–58 (1994). Bitler offered nothing in the summary judgment proceeding to counter this interpretation.

The judge was also right to reject Bitler's claim that Marathon was required to replace the canopies over the gas pumps on three of the properties, including the two on which Marathon let the buildings go to seed. In all three instances Marathon had obtained Bitler's consent to remove the canopies after the gas pumps beneath them were removed, and there is no evidence that the grant of permission was conditioned on Marathon's replacing the canopies. Conceivably such canopies might have value as part of the structure of a fast-food outlet or a bank branch, not to mention a resurrected gas station with above-ground storage tanks. But the Master Amendment does not require Marathon to convert the gas stations that it was busy dismantling to any *specific* commercial use, such as one for which canopies would be suitable.

So much for contract. On to waste, a common law doctrine of great antiquity traditionally used to mediate the competing interests of life tenants and remaindermen. *Finlay v. United States*, 752 F.2d 246, 248–49 (6th Cir. 1985); *Heliker v.*

*Heliker*, 151 N.W. 757, 758 (Mich. 1915); Jedediah Purdy, "The American Transformation of Waste Doctrine: A Plural-ist Interpretation," 91 *Cornell L. Rev.* 653, 662–65 (2006). To illustrate, in the absence of such a doctrine the life tenant of a timberland property would have an incentive to maximize not the value of the property—that is, the present value of the entire stream of future earnings obtainable from it—but only the present value of the earnings stream obtainable dur-ing his expected lifetime. That might lead him to cut down trees before they'd attained their mature growth even if the present value of the timber would be greater if those trees were spared till then. The doctrine of waste forbids the life tenant to alter the property in a way that reduces its value. He can't, in other words, be allowed to steal from the re-maindermen, who are the owners of the property that the life tenant is entitled merely to the use of during his lifetime.

There might seem no need for a separate doctrine of waste, because the life tenant and the remaindermen could negotiate an optimal plan for exploiting the property. And indeed negotiated solutions to potential disputes, where fea-sible, normally are preferable to solutions imposed by judges or other government officials. But since tenant and remain-dermen have only each other to contract with, the situation is what economists call "bilateral monopoly," so transaction costs may be high—if A can negotiate only with B, and B only with A, each has an incentive to be stubborn, in the hope of thereby obtaining as much as possible of the surplus that transaction will create. Moreover, remaindermen may be children, who do not have the legal capacity to make binding contracts—they may even be unborn children.

But when as in this case parties both of whom have an interest in the same property already have a contract defining their respective rights, we have to probe a bit to discover what work the doctrine of waste might do. Between the original lease and the Master Amendment, Bitler and Marathon seem to have covered all the bases. And parties competent to contract (such as adults who are *compos mentis*) can, if they want, contract around the law of waste—in effect negotiate their own private law of waste and enforce it under contract law rather than property law. *Stevens v. Mobil Oil Corp.*, 412 F. Supp. 809, 812 (E.D. Mich. 1976), affirmed, 577 F.2d 743 (6th Cir. 1978); *Lincoln Square Corp. v. Motor City Paper Tube Co.*, 64 N.W.2d 577, 580 (Mich. 1954); *Restatement (Third) of Property (Mortgages)* § 4.6 and comment c, pp. 262–67 (1997).

But the parties didn't do that—didn't by contract exclude waste remedies—perhaps realizing that the law of waste can continue to play a useful role even when the parties have a detailed contract. For example, a lease may not indicate, directly or by implication, every act by which a lessee can impair the value of the property, and so the landlord can still have an action for waste unless the parties are found to have intended the lease to be the exclusive source of their rights.

Also, waste can provide a remedy supplementary to the remedy for breach of contract. True, as in any situation of "election of remedies" (see, e.g., *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 296–97 (2002); *Illinois School District Agency v. Pacific Insurance Co.*, 571 F.3d 611, 615–16 (7th Cir. 2009)), the total compensatory damages awarded in a suit for breach of contract and for waste can't exceed the plaintiff's total loss. But because committing waste is tortious, the plaintiff may

be entitled to punitive damages, see, e.g., *Hausmann v. Hausmann*, 596 N.E.2d 216, 220 (Ill. App. 1992); Ky. Rev. Stat. § 381.350; cf. *Snowden v. D.C. Transit System, Inc.*, 454 F.2d 1047, 1048 (D.C. Cir. 1971), which he couldn't obtain in a suit for just breach of contract. The judge was therefore right to allow waste claims on six of Bitler's properties to go to trial, and wrong to reject the waste claims on Bitler's properties in Adrian and Michigan Center, where its failure as tenant to maintain the buildings impaired the properties' value.

Bitler's contract and waste claims overlap almost completely. The only harm Bitler could not have charged as waste was delay in regaining possession of its properties in a usable condition. But no reason is given to believe the delay has reduced the value of the property (as distinct from income generated by its use); and it is the value of the property, which is the value to which the owner is entitled, that the law of waste protects. *Shiver v. United States*, 159 U.S. 491, 497–98 (1895); *Restatement (First) of Property* § 139 and comment a, pp. 457–58 (1936).

Bitler complains finally, with regard to the four Michigan properties for which the jury awarded waste damages, that Michigan law entitles the victim of waste to double damages, which the judge refused to award. The rule in Michigan is that a "tenant for years who commits or suffers any waste … without having a lawful license to do so, is liable for double the amount of actual damages." Mich. Comp. Laws § 600.2919(2)(a). So only if Marathon was a "tenant for years" is it liable to Bitler for double the actual damages caused by its waste. Originally of course it *was* a tenant for years, but the Master Amendment in 1992 converted the leases from fixed-term leases that would continue on a

month-to-month basis until the remediation was completed and the properties handed back to Bitler. But although in a literal sense Marathon was not a tenant for years during the period of remediation, which is when it committed the waste for which the jury found it liable, the literal sense is not the correct one. The terms "tenant for years" and "estate for years" are inexact references to a commercial or residential lease for a determinable period of time, which "need not be measured in specific numbers of years and may be for more or less than a year." 2 John G. Cameron, Jr., *Michigan Real Property Law* § 20.7, p. 1098 (3d ed. 2005); see also *In re Macomb Occupational Health Care, LLC*, 300 B.R. 270, 285 (Bankr. E.D. Mich. 2003). In other words, all that's required is some formula for determining when a lease for a specified period of time can be terminated outside that period.

And we have that. The Master Amendment eliminated the determinable time periods of 11 and 10 years in the original lease, substituting the indeterminate date of completion of the remediation. There's nothing unusual about such a substitution. Residential and commercial leases normally specify contingencies that will make the term longer or shorter. An example is a "permit contingency" in a lease of premises for a restaurant, which allows termination in the event the tenant is unable to obtain necessary permits. And even the terms in the original leases to Marathon were not fully determinate, since the leases were renewable.

It would not make sense, or conform to the reasonable expectations of the parties, to limit liability for waste or other misconduct by a tenant simply because a lease originally for a specified time—that is, an estate for years—had to be extended for an indefinite period to allow a response to un-

foreseen changes. Those changes were the new EPA regulations in the late 1980s, which required extensive clean-up of the properties. Neither Marathon nor the judge gave any reason for interpreting the Michigan statute literally in such a case.

So the judgment awarding damages for waste regarding the four Michigan properties is vacated with directions to the district court to double those damages. The dismissal of the contract claims relating to the canopies is affirmed, but the dismissal of the contract and waste claims relating to the buildings on the properties in Adrian and Michigan Center is reversed and that aspect of the case is remanded for trial.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED WITH DIRECTIONS.